NOT DESIGNATED FOR PUBLICATION

No. 116,782

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
KANSAS STAR CASINO, L.L.C.
for the Year 2015 in Sumner County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed July 20, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Jarrod C. Kieffer*, *Lynn D. Preheim*, and *Frank W. Basgall*, of Stinson Leonard Street LLP, of Wichita, for appellant/cross-appellee Kansas Star Casino, L.L.C.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee/cross-appellant Sumner County.

Before POWELL, P.J., ATCHESON and BRUNS, JJ.

POWELL, J.: In what has thus far been an annual event, Kansas Star Casino, L.L.C. (Kansas Star) once again appeals from the ruling by the Board of Tax Appeals (BOTA) which established a valuation for ad valorem tax purposes for its real property located in Sumner County, Kansas. The present appeal concerns the 2015 tax year. This court has recently considered appeals in three prior tax years. See *In re Equalization Appeal of Kansas Star Casino*, 52 Kan. App. 2d 50, 362 P.3d 1109 (2015), *rev. denied* 307 Kan. 987 (2017) (2012 tax year); *In re Equalization Appeal of Kansas Star Casino*, No. 115,587, 2018 WL 2748748 (Kan. App. 2018) (unpublished opinion) (2013 tax year); *In re Equalization Appeal of Kansas Star Casino*, No. 116,421, 2018 WL 2749734 (Kan. App. 2018) (unpublished opinion) (2014 tax year). While a number of the issues

1

are new, the parties continue to hotly contest BOTA's findings on points in which Kansas Star's and Sumner County's views are widely divergent.

In its latest appeal, Kansas Star complains that BOTA erred (1) by finding that the arena portion of the casino complex should be depreciated by only one-third rather than finding the arena was obsolete and (2) by classifying 12.69 acres of the property used for drainage as commercial property. Sumner County cross-appeals, arguing (1) BOTA improperly classified 63.5 acres of the property as agricultural land; (2) BOTA's land value of $76,500 per acre is not supported by substantial evidence and is unreasonable, arbitrary, and capricious; (3) BOTA's decision to apply a 35% depreciation rate is an erroneous application of the law, is not supported by substantial evidence, and is unreasonable, arbitrary, and capricious; and (4) BOTA's decision to reject the County's inclusion of a 12.5% entrepreneurial profit is not supported by the record and is unreasonable, arbitrary, and capricious. For reasons we more fully explain below, we agree with the parties that BOTA's depreciation calculation is unsupported by the record and must be reversed and remanded for reconsideration. We affirm BOTA in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

Kansas Star is one of four state-sponsored gaming enterprises in Kansas authorized under K.S.A. 74-8733 et seq., the Kansas Expanded Lottery Act (KELA), and is located in the south central gaming zone. In 2007 the Legislature passed KELA which divided the state into four gaming zones—northeast, south central, southwest, and southeast—and authorized the Kansas Lottery to operate a single gaming facility in each zone. K.S.A. 2017 Supp. 74-8734(a), (d), and (h)(19). Sedgwick County and Sumner County comprise the south central gaming zone. K.S.A. 2017 Supp. 74-8702(f). Kansas Star is the gaming facility manager for the south central gaming zone, and its casino is located on property it owns in the far northeast corner of Sumner County near the

2

Sedgwick County line. Kansas Star operates the gaming facility as the Kansas Star Casino and Arena Events Center.

A.     *The Subject Property*

Kansas Star's gaming facility sits on two formerly separate tracts of land, referred to as the Wyant and Gerlach tracts. The property is located in the city of Mulvane in Sumner County, near the border with Sedgwick County, but the land is in a rural, mostly undeveloped area located 8 miles west of Mulvane. The property was annexed into the Mulvane city limits during the management contract bidding process so the property could be zoned for casino use. The land around the casino is sparsely populated and used mostly for farming.

Peninsula Gaming, Kansas Star's former parent company, acquired both the Wyant and Gerlach tracts in July 2010, for a total purchase price of $17 million, and then combined the tracts into a single parcel of land consisting of 201.2 acres. The site was zoned as a Planned Use Development (PUD), which allows for casino gaming. After replatting the property for purposes of the PUD, the size of the combined tract was measured to be approximately 197.5 acres. The acreage was divided by the County into two parcels:  195.31 acres as the main parcel and approximately two acres for an EMS station. The two-acre tract for the EMS station was leased to the City of Mulvane for a period of 99 years beginning in December 2011. We will refer to the main tract as comprising 195.5 acres for rounding-up purposes as has been done in previous litigation.

The 195.5 acres held by Kansas Star is more land than is necessary for the casino itself, and Kansas Star planned to use the undeveloped land for other projects. The northwest corner of the commercial-use property is largely unimproved with the exception of two driveways. At the time Kansas Star acquired the total site, it planned to use the excess land for an RV park, a maintenance building, livestock feed and supply

3

improvements, and other commercial development. However, those plans for future development were never realized after Kansas Star determined the market was satiated in these areas. For the 2015 tax year, Sumner County classified the entire 195.5-acre parcel as commercial and industrial.

Of the 195.5 acres of the main parcel subject to valuation, 63.5 acres were directly used for the production of agricultural crops during 2015. On December 20, 2013, Kansas Star entered into a lease agreement allowing Mark Hardison to farm approximately 63.5 acres originally planned for future development in exchange for mowing the drainage areas and $1 in consideration. Hardison planted soy beans on the leased acreage in 2014 and both soy beans and wheat in 2015. None of the 63.5 acres has been used as part of the casino operations. Because the property sits on low ground and the water table is high, two drainage areas are used as drainage wasteland for the agricultural-use acreage. The remaining 119 acres are dedicated to the casino or in support of the casino.

B.    *The Arena*

Construction of Kansas Star's facility was done in three phases. During Phase 1A—December 26, 2011, to December 21, 2012—Kansas Star conducted gaming operations in a temporary casino housed in its arena while the permanent casino was being constructed. The permanent casino opened in December 2012—completing Phase 1B of the project—after which time Kansas Star began the process of converting the arena space from a temporary casino back into an arena and equine event center. The gaming floor space in the permanent casino is more than double the gaming floor space in the temporary casino.

Phase 2 of the project consisted of construction of a conference center, a maintenance building, and an open-air event pavilion which included a covered arena and 183 horse stalls. The arena building has 2,263 permanent seats with an additional 1,933

4

seating capacity on the lower risers. Additional seating is available for the arena floor in "concert mode," for a total seating capacity of 6,596. The first event, a concert, was held on June 29, 2013.

The arena component of the property has not proven to be profitable, and Kansas Star has concluded that the arena is fundamentally incompatible with its gaming operations. It now markets half house and smaller shows at the arena because of the losses sustained when booking full house shows. Revenue data provided in the record shows that gaming revenue decreases during large events held at the arena. High-end players are less likely to visit the casino during these events due to full parking lots, long lines, and big crowds.

Equestrian events held at the arena have typically lost more money than the concerts and other entertainment events. Dan Ihm, vice president and general manager for Kansas Star, testified that Kansas Star has hosted only nine equine events in two years because "they're just too costly." The equestrian events have a lot of expenses associated with them, and many potential clients considering the arena have thought the price was too expensive. Kansas Star is open to hosting more equine events, but it has not had success in attracting many.

Kansas Star's initial proposal called for eight buildings, consisting of six separate barn buildings with approximately 500 stalls, one indoor warm-up arena, and an outdoor practice arena. After the planned arena and equine event center proved to be unprofitable, Kansas Star negotiated with the Kansas Lottery to amend its management contract, and Phase 2 was modified to allow for the funds dedicated to that portion of the project to be shifted away from additional arena investment and toward conference space. The conference space opened in early January 2015, after the date of valuation in this case.

Kansas Star's arena is one of four arenas in the Wichita area competing in a saturated arena market and is at a competitive disadvantage due to its location. Ihm described the very competitive nature of the market and testified that the arena operated at a loss of $575,000 in 2014. However, this loss was less than projected by Kansas Star in its gaming proposal submitted during the bidding process for the casino management contract. Kansas Star projected operating loss for the arena for the first four years of operation of (1) $790,170 in 2013; (2) $711,332 in 2014; (3) $689,428 in 2015; and (4) $534,046 in 2016. Kansas Star invested approximately $20 million in Phase 2 construction but did not see any significant increase in revenue or earnings before interest, tax, depreciation, and amortization (EBITDA).

Ihm testified that if Kansas Star had not been contractually obligated by the contract and bid process to build and operate the arena, he would not have built either the equine facility or the concert venue in order to maximize the profitability of the casino. In fact, casino revenue peaked in the summer of 2013 with the "grand opening bump" but then steadily fell after that, leveling off in 2015.

C.     *The Appraisals*

As it had in prior tax years, Sumner County hired Richard Jortberg, MAI, to appraise the subject property for tax year 2015. The County originally valued the property at $176.4 million based on a mass appraisal performed by Jortberg. But Jortberg later performed a full appraisal report, valuing the property at $167 million. Kansas Star appealed this value to BOTA where the County had the evidentiary burden to show the validity and correctness of its valuation of the property. See K.S.A. 2017 Supp. 79-1609. Kansas Star retained Bliss Associates appraisers Robin Marx, MAI, and Robert Jackson, a Kansas certified general appraiser, to appraise the property. Based on their report, Kansas Star asserted a value of around $76 million, including a value of $11,970 for the acreage dedicated to agricultural use.

1.      *The County's appraisal expert*

Jortberg has numerous years of experience appraising casinos for the taxing authorities in Colorado, and he has appraised Kansas Star's property for the County for four years. Jortberg considered all three approaches to value—the sales comparison approach, the cost approach, and the income approach—but he concluded the cost approach was the most appropriate methodology. The cost approach has three components: (1) land value; (2) reproduction/replacement costs; and (3) depreciation.

To calculate land value, Jortberg performed a highest and best use analysis and concluded that it would be physically possible, legally permissible, financially feasible, and maximally productive to use the subject property for gaming/casino purposes, as it was the property's highest and best use, both as vacant and improved. Jortberg decided not to rely on a sales comparison approach because of a lack of comparable sales that would provide a good indication of transaction-based value.

Jortberg relied on five comparable sales to derive land value: (1) the acquisition of the Wyant tract; (2) the acquisition of the Gerlach tract; (3) the unexercised option for the nearby Storey/Mangus tract; (4) the unexercised option for the nearby Grother tract; and (5) the speculative sale of the Boot Hill Casino property in Ford County. He also reviewed land sale activities in other gaming markets. Jortberg eventually dismissed the Boot Hill sale as a valid comparison because it was a speculative sale without gaming approvals and was in a smaller market. He also dismissed the unexercised option agreements because they were in inferior locations and were acquired to forestall competition for the management contract. Jortberg ultimately concluded that the $17 million price that Kansas Star paid to acquire the property was the best evidence of its value.

Unlike in 2014, Jortberg did not adjust the land value for any market conditions in 2015

> "[b]ecause in [2014] it massively exceeded—significantly exceeded their initial proforma, and I adjusted the land value upwards. And this year, there was a drop in revenues. So they're closer to the proforma. It's inappropriate to have an increase in land value when they're achieving the results that were initially projected on that timeline."

Jortberg testified that Kansas Star's agricultural lease was not relevant to his land valuation because the predominant use of the property was casino gaming, not agriculture. Jortberg also explained that the lease could be canceled with 30 days' notice and was not a long-term encumbrance on the property. Jortberg noted that the agricultural lease did not generate any income for Kansas Star, but it might reduce costs because Hardison mowed the drainage ditches.

Jortberg determined that the entire 195.5 acres, including the mostly unused northwest tract, were necessary and important to Kansas Star because of long-term gaming potential. Jortberg explained that it benefits the casino to have land ready for additional entertainment elements. In addition, much of the unused acreage has been designated as drainage easements, which are also necessary to the property. Jortberg concluded the unused acreage was not excess land because it could be used for future expansion, and the former general manager of Kansas Star had told Jortberg that he had no intent to sell the unused acreage. Jortberg concluded the $17 million paid to acquire the subject property was the best evidence of its value. He valued the 195.5 acres at $86,957 per acre.

For the second step of the cost approach, Jortberg calculated the reproduction/ replacement cost of the subject property. Jortberg started with actual construction costs reported by Kansas Star and applied an adjustment for inflation of 3%. He then applied a

8

12.5% entrepreneurial incentive to the reproduction cost, which he explained was appropriate because an entrepreneur would expect to receive a profit over and above its investment costs as incentive for developing the property. He concluded that reproduction costs new were about $155.6 million.

For the final step, Jortberg considered depreciation and applied a $1.11 million allowance for physical depreciation. He calculated this amount by using the Marshall Valuation Service (MVS) curvilinear depreciation tables. He concluded the functional/economic obsolescence amounted to $3.8 million. Jortberg used the MVS curvilinear depreciation table rather than straight-line depreciation because he believed the straight-line depreciation would inaccurately reflect changes in value over time.

In analyzing functional obsolescence, Jortberg explained that functional obsolescence has two parts. First, he recognized a reduction in value of $3.8 million, derived from items torn out during the arena renovation, architectural fees that were written off, and some demolition. Second, Jortberg determined the arena was not superadequate because (1) it was built by a highly experienced professional gaming company; (2) arenas were a typical amenity for casinos; (3) studies by the developer indicated that the arena would drive visitation to the property and provide a positive economic benefit; and (4) building the arena was a legal requirement of the taxpayer's management contract. Jortberg also concluded there was no economic obsolescence because there was no evidence that the value of the property was negatively affected by external factors.

Jortberg considered but did not apply the sales comparison approach to value. When asked if he was able to find comparable sales to allow him to value the property, Jortberg responded:

9

"The gaming industry is an income driven industry. It's not a sales comparison approach industry. So when you look at the sales comparison approach, look at EBITDA multipliers, . . . it's really not an estimate of value because it's not like a residential market where there are so many sales. We draw important valuation conclusions from the sales."

Jortberg also considered the income approach to value. Under this approach, he first determined Kansas Star's stabilized earnings before interest, tax, depreciation, and amortization (EBITDA) and an appropriate EBITDA multiplier range. By multiplying EBITDA and the EBITDA multipliers, Jortberg concluded that the stabilized enterprise value or going concern value fell within a range of $545 to $725 million, which he rounded to a midpoint of $630 million. Jortberg acknowledged that he was not a fan of the allocation approach in this case and he did not rely on it. He also recognized that his allocation percentages would be a bit off because he was applying typical market allocation percentages to a monopoly property, which has more-than-typical intangible value.

After reconciling his valuations, Jortberg concluded the cost approach analysis was the best indicator of value because it was based on actual costs.

2.    *Kansas Star's appraisal experts*

Marx and Jackson collectively prepared an appraisal for Kansas Star on behalf of Bliss Associates. Marx had previous experience working with casino properties, and both Marx and Jackson had experience appraising special use properties. Jackson testified on behalf of Kansas Star.

In approaching the appraisal, Jackson valued the property using two extraordinary assumptions: (1) the management contract was in place and would be renewed after its expiration at the conclusion of the initial 15-year term; and (2) the management contract

was transferable to a qualified third-party purchaser with no additional privilege fee. Consistent with these assumptions, Jackson determined that the highest and best use of the property was the current use as a mixed-use gaming and entertainment development.

Like Jortberg, Jackson considered all three approaches to value but reached conclusions only in the cost and income approaches. Jackson's cost approach included a land value analysis, replacement cost analysis, and an obsolescence/depreciation analysis. Beginning with land value, Jackson looked at the five available casino-site land transactions in Kansas, consisting of sales of the Gerlach and Wyant tracts; the two tracts that comprise the Boot Hill Casino in Dodge City, Kansas; and the Hollywood Casino in Kansas City, Kansas.

Jackson valued the 119.8 acres of land at $76,500 per acre, or about $9.1 million. Jackson testified this value was reasonable in light of the Gerlach tract purchase price of $8.9 million because the improved commercial area was essentially contained within the boundaries of the former Gerlach tract. In contrast to Jortberg, Jackson did not include the land devoted to agricultural use in the $76,500 per acre figure. The stipulated value of the 63.5 acres subject to the agricultural lease was $11,970.

Jackson then estimated reproduction costs for the property's improvements, using Kansas Star's actual construction costs. Jackson found the relevant construction costs equaled $135.5 million and then adjusted those costs for inflation to estimate reproduction costs. For replacement cost new, Jackson used an inflation-adjusted reproduction cost of the improvements to the subject property—$348.90 per square foot or about $146.1 million. Jackson did not make an entrepreneurial incentive adjustment.

Jackson applied a 4% allowance for physical depreciation, noting that the subject property was 2 years old and estimated to have a 50-year economic life. Jackson concluded that replacement cost new less depreciation of the subject property was $67.3 million.

Jackson performed a combined functional and external obsolescence analysis and concluded that 52% of the real estate was obsolete due to superadequacy. In other words, $72.9 million was applied to account for the requirements of Kansas Star's license to operate the casino. As noted, Kansas Star was required to have the convention center, arena, and pavilion as part of its gaming contract. In addition, the net operating income had declined from levels achieved during the grand opening. Jackson extracted the real estate costs that were not supportive of value and deducted them as obsolescence. Jackson explained that there was a misconception that a property built by experienced developers would not have functional obsolescence soon after it is built because "[p]eople do make mistakes in every industry, and the gaming industry is no different." In this case, Jackson believed that Kansas Star's ancillary facilities were fully obsolete because they had not generated revenue sufficient to justify their construction.

Jackson determined that a 52% deduction for functional and external obsolescence was appropriate. He reached this number by finding that $70 million in improvements were attributable to the casino—about 48%—leaving 52% for ancillary facilities. Jackson found that all of the ancillary facilities were built as a required element of the Kansas Star's legal obligations under its contract and under KELA.

After combining the land value ($9.1 million) and reproduction costs less depreciation ($76.5 million), Jackson deducted an additional $497,839 in costs associated with the equine facility which was not yet complete as of the valuation date. Under the cost approach, Jackson concluded the value of the property was $76 million.

12

Jackson distinguished between the developed land necessary for the support of casino operations and the undeveloped land dedicated to agricultural use and drainage. Jackson classified 119 acres as developed and 76 acres as undeveloped. When asked why he included the 12.69 acres of drainage within the agricultural classification, Jackson explained:

> "[I]t's initially intended through the PUD to be part of the drainage for if they do develop that northern site. Now, they have not done that, and its current [use] is ag . . . . Per, I believe it's the PVD designations, they have within it a what's called the non-productive classification for agricultural land, and it's also called wasteland. And one of the [criteria] that they have for it is area of land that has habitual ponding or wet and is not productive. And as a result the land on the north side that is dedicated for drainage of . . . what would be the improvements if they were built is effectively considered waste or nonproductive land per the PVD classifications."

During cross-examination, Jackson acknowledged the PUD for the property specifies what the drainage easements may be used for and that in order to change its overall use, it would need to be changed by the PUD.

Jackson also performed an income approach to estimate the value of the property. Because the property is an atypical monopoly operation, the allocation approach presented unique issues. Jackson explained that the limited license monopoly created a higher EBITDA than in a typical market.

Under this approach, Jackson explained that he started with Kansas Star's projected stabilized EBITDA of $79.5 million. Next, Jackson reviewed numerous casino sales to determine an average EBITDA multiplier of 7.7%. Jackson applied a 7.7% multiplier to his industry-average $29.25 million EBITDA estimate, which led to a going concern estimate of $225 million. Jackson estimated Kansas Star's actual going concern value by multiplying the stabilized EBITDA of $79.5 million by a multiplier of 7% (the

13

actual indicated figure of the casino's portfolio sale), which led to a going concern estimate of $556 million. Finally, Jackson applied a 30% real estate allocation percentage to his market or typical casino figure, which generated real estate values of $67.6 million. After completing final calculations and adjustments under parallel methods, Jackson concluded values of $76.6 million under one method and $83.5 million under the other. Under the income approach, Jackson reached a final estimated value of $75.55 million.

Jackson ultimately relied on the cost approach because of the availability of actual cost information. Jackson noted that Bliss "put a heavier weight on the cost approach and relied upon it." The Bliss appraisal valued the subject property at $76 million.

Kansas Star also presented expert testimony from Cory Morowitz, a gaming consultant. Morowitz testified about the effects of the monopoly market in the south central Kansas gaming zone and on the development and value of the subject property. Specifically, Morowitz testified that the south central gaming zone was one of the few true monopoly opportunities left in the country, with modest tax rates and costs of entry. This environment allowed an operator to generate larger-than-typical profit margins. Kansas Star reaps the benefit of being close to the Wichita population but fairly far from any competitors. Because of this, Kansas Star did not need to spend a significant amount of money on marketing. Morowitz noted that Kansas Star's marketing expense was less than 5%, compared to up to 40% spent in competitive markets.

Morowitz analyzed the license fees paid by gaming operators throughout the country and concluded that the $25 million license fee charged by the State of Kansas was about $24 million less than it could have charged, so it essentially gave the companies "some money to play with in their bid." Morowitz explained that the bidders

for the south central gaming zone's management contract would have a very high rate of return because of the low license fees, the monopoly in the area, and the reasonable tax rate.

While the south central gaming zone presents an excellent opportunity, it is also somewhat limited. Morowitz testified that although the Kanas Star has the Wichita-metro area easily satiated, it has few prospects for additional revenue by drawing visitors from other areas because the closest significant population bases are already well served. Because of this, Morowitz saw no real opportunity for future development. Moreover, additional development at the site could be a potential distraction because it could take away the time and money that visitors planned to spend on gaming.

Morowitz testified that he believed Kansas Star was underutilizing the arena compared to other casinos because it typically operated at half capacity or less. However, he noted that the arena had too many seats in comparison to Kansas Star's casino capacity, which essentially crowded out gaming demand. Morowitz explained that the data indicated the arena events tended to decrease the number of more lucrative gamers in favor of casual, less lucrative gamers, resulting in a net loss in gaming revenue. Morowitz said that "the bottom line is the casino actually lost revenues on event days" so "it clearly is not working as designed." Morowitz was unable to find any evidence that Kansas Star's arena was contributing revenue or profitability to the overall operation.

D.    *BOTA's Decision*

Despite applying the income approach in 2013 and 2014, BOTA reverted back to the cost approach in 2015.

In first resolving the parties' dispute regarding the classification of the real estate, BOTA determined the 63.5 acres leased to Hardison should be classified as land devoted

15

to agricultural use. BOTA explained: "There is no evidence that any recreational use is being made of the portions that are farmed. Mr. Hardison is farming the property by growing grain crops. The evidence does not show that it is being done for personal purposes."

BOTA rejected Kansas Star's assertion that a portion of the acreage set aside for drainage and storm water retention should also be classified as agricultural. BOTA concluded: "The Board finds that the need for these drainage areas is due to the commercial activities on the subject property, namely the buildings and parking lots. Furthermore, no agricultural activities take place on these areas. Therefore, those properties should remain classified as 'Commercial.'"

Regarding the land value of the remaining commercial acreage, BOTA acknowledged that Kansas Star paid approximately $87,000 per acre in 2011, but it adopted Jackson's per-acre figure of $76,500. BOTA found Jackson's figure to be more persuasive, reasoning:

> "Mr. Jackson also considered the same sales as Mr. Jortberg but also considered a second Dodge City sale and the sale of the property for the Hollywood Casino in Kansas City, Kansas. These sales all adjust to $76,500 per acre. The Board finds that Mr. Jackson's land value is more persuasive as it considers the sales of those properties besides the subject property and makes proper adjustments to account for differences in time, size, amenities, and location."

Applying the $76,500 per acre figure to the 132 acres classified as commercial resulted in a land value of $10.1 million.

In comparing the two appraisals, BOTA found that "Jackson's appraisal for the Taxpayer carries more weight than Mr. Jortberg's appraisal done for the County." In rejecting Jortberg's entrepreneurial profit adjustment, BOTA noted:

16

"[T]he evidence does not show that if it were appropriate to include [an adjustment for entrepreneurial profit] in the first place, 12½% would be the proper figure. In this case, due to the circumstances of the subject property being a build-to-suit, owner-occupied property, any development costs are a part of the business rather than the real estate."

BOTA also adopted Jackson's physical depreciation figure of 4%, finding that it "better accounts for the age of the subject property and its economic life."

In estimating functional and economic obsolescence, BOTA was presented with two strikingly contrasting views. The County asserted the ancillary facilities suffered from no obsolescence, while Kansas Star claimed the facilities were fully obsolete. BOTA rejected both of the experts' obsolescence opinions, stating:

"The evidence shows that the arena, convention center, and equine center do not contribute to the overall profit of the subject property. In fact, they detract from it. Therefore, some allowance should be given to account for this economic obsolescence. Mr. Jackson's report indicated that the arena was over built by two thirds; consequently, the 52% economic obsolescence figure used by Mr. Jackson, should be reduced by a third to 35%."

After accounting for depreciation, BOTA concluded the fair market value of the commercial portion of the subject property was $101.5 million as of January 1, 2015.

The County filed a motion for reconsideration, arguing (1) BOTA's decision to adopt Jackson's land value of $76,500 per acre was not supported by substantial evidence; (2) BOTA's classification of 63.5 acres of the subject property as agricultural was an error of law; and (3) BOTA's decision to apply a 35% depreciation rate constituted an error of law and was not supported by substantial evidence. The County argued that BOTA's decision was unreasonable, arbitrary, and capricious. BOTA denied reconsideration, merely noting that "no evidence or arguments are offered that would

17

persuade the Board that the original order should be modified or that reconsideration should be granted."

Kansas Star filed a petition for judicial review; the County filed a cross-petition.

*Standards of Review*

As both parties have done in the present case, a taxpayer has the right to appeal an order of BOTA by filing a petition for judicial review with the Court of Appeals or the district court under K.S.A. 2017 Supp. 74-2426(c). We review BOTA's decision in the manner prescribed by K.S.A. 77-601 et seq., the Kansas Judicial Review Act (KJRA).

K.S.A. 2017 Supp. 77-621(c) sets out eight standards under which a court shall grant relief. In this case, the parties are relying on K.S.A. 2017 Supp. 77-621(c)(4), (c)(7), and (c)(8) to support their arguments that relief should be granted.

K.S.A. 2017 Supp. 77-621(c)(4) requires a court to grant relief if the agency "erroneously interpreted or applied the law."

K.S.A. 2017 Supp. 77-621(c)(7) requires a court to grant relief if "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2017 Supp. 77-621(d) defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. A reviewing court must determine whether the evidence supporting an agency's factual findings is substantial when considered in light of all the evidence but does not reweigh evidence or engage in de novo review. K.S.A. 2017 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84, 239 P.3d 66 (2010). "Substantial competent evidence possesses both relevance and substance and provides a substantial

18

basis of fact from which the issues can be reasonably determined." *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009).

Finally, K.S.A. 2017 Supp. 77-621(c)(8) requires a court to grant relief if BOTA's "action is otherwise unreasonable, arbitrary or capricious." The burden of proving arbitrary and capricious conduct lies with the party challenging the agency's action. *Sierra Club v. Moser*, 298 Kan. 22, 47, 310 P.3d 360 (2013).

While the County bore the burden of proof before BOTA under K.S.A. 2017 Supp. 79-1609, on appeal the burden of proving the invalidity of BOTA's actions is on the party asserting the invalidity. K.S.A. 2017 Supp. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016). When reviewing an agency action as set forth in K.S.A. 2017 Supp. 77-621(c), we take into account the rule of harmless error. K.S.A. 2017 Supp. 77-621(e); *Sierra Club*, 298 Kan. at 47.

Tax statutes are to be construed strictly in favor of the taxpayer. *In re Tax Appeal of Harbour Brothers Constr. Co.*, 256 Kan. 216, 223, 883 P.2d 1194 (1994); *In re Tax Protest of Jones*, 52 Kan. App. 2d 393, 396, 367 P.3d 306 (2016), *rev. denied* 305 Kan. 1252 (2017). Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). In making the unlimited review of a Kansas statute, no deference is given to the agency's interpretation. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013); *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, Syl. ¶ 2, 228 P.3d 403 (2010). This ruling has been specifically applied to decisions of BOTA. See *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 472, 239 P.3d 96 (2010).

When determining the validity of an assessment of the valuation of real property for uniformity and equality in the distribution of taxation burdens, the essential question

is whether the standards prescribed in K.S.A. 2017 Supp. 79-503a have been considered and applied by taxing officials. *Krueger v. Board of Woodson County Comm'rs*, 31 Kan. App. 2d 698, 702-03, 71 P.3d 1167 (2003), *aff'd* 277 Kan. 486, 85 P.3d 686 (2004).

The test for finding arbitrary and capricious conduct is determining "'whether [a] particular action should have been taken or is justified,'" such as the reasonableness of an agency's exercise of discretion in reaching a determination or whether the agency's action was without foundation in fact. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010); *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). "Flipping a coin, for example, would be incompatible with weighing of evidence or drawing conclusions necessary to support [the] decision. That would be true without regard to the soundness of the outcome, and a court would act within its authority to vacate the result as arbitrary." *R.W.D. #2 v. Board of Miami County Comm'rs*, No. 105,632, 2012 WL 309165, at *10 (Kan. App. 2012) (unpublished opinion). An order is arbitrary and capricious if it is unreasonable or without foundation in fact. *Citizens Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 47 Kan. App. 2d 1112, 1124, 284 P.3d 348 (2012).

> "A challenge under K.S.A. 2010 Supp. 77-621(c)(8) attacks the quality of the agency's reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010) (stating that agency may have acted arbitrarily when it fails to properly consider factors courts require it to consider to guide its discretionary decision); *Wheatland Electric Cooperative*, 46 Kan. App. 2d 746, Syl. ¶ 5 (providing factors to consider when determining whether agency acted within its discretion); Gellhorn & Levin, Administrative Law and Process in a Nutshell, p. 103 (5th ed. 2006) ('[T]he emphasis in arbitrariness review [is on] the *quality of an agency's reasoning.*')." *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1115, 269 P.3d 876 (2012).

20

*General concepts of ad valorem taxation*

All real and tangible personal property in Kansas is subject to taxation on a uniform and equal basis unless specifically exempted. Kan. Const. art. 11, § 1(a); K.S.A. 79-101. The Kansas Legislature has enacted a statutory scheme to ensure property is appraised for ad valorem tax purposes in a uniform and equal manner. Central to this statutory scheme is the requirement that property be appraised at fair market value as of January 1 of each taxable year, unless otherwise specified by law. K.S.A. 79-1455.

When determining ad valorem valuation, Kansas law requires valuation of the fee simple interest, which is defined as

> "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008). Stated another way, '[o]wnership of the fee simple interest is equivalent to ownership of the complete bundle of sticks [property rights] that can be privately owned.' The Appraisal of Real Estate, p. 112. . . .

> "Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion.' (Emphasis added.) It is clear, therefore, that the fair market value statute values *property* rights, not *contract* rights." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130-31, 275 P.3d 56 (2012).

21

The concept that Kansas law requires valuation of the fee simple interest is consistent with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires that all rights and privileges in real property are to be valued. However, "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

In determining the ad valorem valuation, Kansas law assumes a hypothetical sale as of January 1 of the applicable tax year. K.S.A. 2017 Supp. 79-503a. "Each year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." K.S.A. 79-1455. As such, the Kansas statutory scheme "is a surrogate for a real marketplace event; the statute requires the appraiser to pretend, in effect, that each piece of property is sold on January 1 of the year in which the appraisal is done in an arms length transaction." *Hixon v. Lario Enterprises, Inc.*, 19 Kan. App. 2d 643, 646-47, 875 P.2d 297 (1994), *aff'd as modified* 257 Kan. 377, 892 P.2d 507 (1995). This pretend transaction is often referred to as a hypothetical sale of the subject property.

Key to determining a value for this hypothetical sale is fair market value. K.S.A. 2017 Supp. 79-503a defines fair market value and provides guidance on the factors used to determine fair market value.

> "'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the

22

present value of the special assessment to the sales price. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

This list of factors is nonexclusive.

23

Fee simple interest is also to be considered in determining hypothetical conditions under which a January 1 sale would take place. The hypothetical sale must include only the sticks in the bundle of rights and may not include intangible interests or enterprise value. See K.S.A. 79-102; *In re Tax Protest of Strayer*, 239 Kan. 136, 142-43, 716 P.2d 588 (1986) (intangible property interests not taxable for property tax purposes).

Appraisals for ad valorem taxation purposes must be performed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP). K.S.A. 79-506(a). In addition, the ad valorem appraisal process must "conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 2017 Supp. 79-503a.

DID BOTA ERR IN DEPRECIATING THE ARENA BY ONE-THIRD
RATHER THAN FINDING THE ARENA WAS OBSOLETE?

Kansas Star first argues that BOTA erred as a matter of law and relied on a fact not supported by the evidence when it determined that Jackson's 52% economic obsolescence figure should be reduced by one-third to 35%. Kansas Star asserts this adjustment was unreasonable, arbitrary, and capricious. The County agrees that BOTA's depreciation analysis is unsupported by substantial competent evidence and merits reversal.

Under the third step of the cost approach, an appraiser estimates the amount of depreciation, if any, for a property's improvements. Depreciation has three primary components: (1) physical deterioration, (2) functional obsolescence; and (3) external obsolescence. The Appraisal of Real Estate, Appraisal Institute, 614 (14th ed. 2013).

Functional obsolescence can take two forms: functional inadequacy and functional superadequacy. Functional inadequacy is a deficiency in the structure,

24

materials, or design of an improvement, such as too few bathrooms in a residence or low warehouse ceiling heights. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). Functional superadequacy is "some aspect of the subject property [that] exceeds market norms" or special features built to the owner's specifications that "would not appeal to the market in general," such as an expensive in-ground swimming pool in a low-cost neighborhood or a warehouse building with excess office space. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013).

Even though the parties agree that BOTA erred on this issue, Kansas Star and the County have polar opposite views about whether the improvements on Kansas Star's property are superadequate. As in prior years, the County asserts that the subject property suffers from no superadequacy, while in contrast Kansas Star argues that the ancillary facilities are 100% superadequate because they do not generate revenue sufficient to justify their construction.

"Superadequacy" is some aspect of the property that exceeds market norms, such as "special features . . . that would not appeal to the market in general." The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). The Appraisal Institute advises as follows:

> "A superadequacy is a type of functional obsolescence caused by something in the subject property that exceeds market requirements but does not contribute to value an amount equal to its cost. The superadequacy may have a cost to carry (i.e., higher operating costs) that must be considered. A superadequacy is only curable if it can be removed and value is added (or costs reduced) to the property . . . by its removal." The Appraisal of Real Estate, Appraisal Institute, 624 (14th ed. 2013).

Kansas Star points to an example of superadequacy in The Appraisal of Real Estate and likens its arena to a swimming pool at an apartment complex that costs $5,000 a year to maintain but for which the apartment complex receives no additional rent. But

25

the County points out that the flaw in this argument is that the apartment complex is not legally required to have a pool. Here, the removal of the arena would violate KELA and Kansas Star's management contract. So without the arena, Kansas Star would be putting its gaming license at risk.

K.S.A. 2017 Supp. 79-503a(j) provides that factors to be considered in assessing fair market value include "restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies." Because of this, the County asserts that Kansas Star's position—that a hypothetical sale between a buyer and a seller would include a 100% reduction in value for ancillary facilities that are legally required and fundamentally intertwined with the real property's value—is without merit. Kansas Star responds that it is not suggesting that the ancillary facilities should be removed but that they do not add value to the subject property.

While BOTA rejected both appraisers' depreciation analyses, it found the property suffered from some economic obsolescence and reduced Jackson's economic obsolescence figure of 52% by one-third to 35%.

Kansas Star asserts that BOTA's one-third reduction is based on an incorrect interpretation of Morowitz' testimony. The Bliss appraisal indicated that Kansas Star had 2.9 arena seats per gaming position at its casino, whereas the average for 23 other casino/arena properties was only 0.84 seats per gaming position. Morowitz' report indicated that the subject property's ratio of gaming positions to arena seats was three times higher than the average of similar casinos. But Kansas Star contends that this information was only the first step of Morowitz' analysis and this evidence is not synonymous with a conclusion that the arena is only two-thirds overbuilt. Kansas Star asserts BOTA erred by taking the additional step and reducing the award by one-third when the evidence does not support such a conclusion.

26

The County suggests that BOTA's conclusion is not USPAP compliant. "Each parcel of real property shall be appraised at its fair market value in money, the value thereof to be determined by the appraiser from actual view and inspection of the property." K.S.A. 79-501. "The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 2017 Supp. 79-503a.

"K.S.A. 79-505 and K.S.A. 79-506 require that appraisal practice be governed by [USPAP]. These standards are embodied in the statutory scheme of valuation, and a failure . . . to adhere to them may constitute a deviation from a prescribed procedure or an error of law. [Citations omitted.]" *In re Tax Appeal of Brocato*, 46 Kan. App. 2d 722, 727, 277 P.3d 1135 (2011). USPAP requires that an appraiser "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal." USPAP, Standard 1-1(a).

The County asserts that if either party had suggested that superadequacy could be measured by comparing seats-per-gaming position, then that methodology would have been challenged as a violation of USPAP. As a previous panel of this court determined, BOTA must also comply with USPAP: "[USPAP] standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 735, 88 P.3d 242 (2004).

Our role is not to reweigh evidence. Findings that are supported by substantial evidence will be upheld even though evidence in the record would have supported contrary findings. *Chowning v. Cannon Valley Woodwork, Inc.*, 32 Kan. App. 2d 982, 987, 93 P.3d 1210 (2004). But BOTA's factual findings must have support in the record.

27

BOTA's conclusion that the arena was two-thirds overbuilt is not supported by the evidence. The Bliss appraisal concluded that the arena was 100% obsolete because it contributed no value to the overall property. But BOTA referred to "Mr. Jackson's report" in concluding that the arena was overbuilt by two-thirds. Neither party disputes that this was an error in fact. The only evidence that the arena was two-thirds overbuilt was from Morowitz, who stated in his report that the size of the Kansas Star Arena "is inappropriate relative to its casino and hotel operations" and "as much as two-thirds of the arena's capacity may not be needed or is functionally obsolete." As explained by Kansas Star, this was only the first step Morowitz took in his analysis, not his final conclusion.

More important than the factual error, there was no evidence that BOTA's methodology of comparing Kansas Star's seats-per-gaming position to casino/arena gaming enterprises in competitive markets was an appropriate method for measuring depreciation. In calculating depreciation for functional obsolescence, the Appraisal Institute provides a five-step formula:  (1) identify the cost of the existing item; (2) deduct depreciation previously charged; (3) if functional obsolescence is curable, add up all of the costs associated with curing the item, and if incurable, add value of the loss; (4) if curable, subtract cost of the proper item if included in new construction, and if incurable, subtract depreciated cost of the proper item if included in new construction; (5) add up all the entries to derive the total functional obsolescence attributable to each factor. The Appraisal of Real Estate, Appraisal Institute, 627 (14th ed. 2013). Both parties presented competing evidence about calculating depreciation. Morowitz' stand-alone option that the arena was two-thirds overbuilt is a fact that appears in the record, but merely reducing the economic obsolescence figure by one-third is not an accepted method of calculating functional obsolescence. BOTA's decision to rely on a single data point in its calculations ignores the record as a whole and does not comply with approved appraisal practices.

BOTA's conclusion that Jackson's 52% economic obsolescence figure should be reduced by one-third is not supported by evidence that is substantial when considering the record as a whole. Further, BOTA misapplied the law when it failed to comply with USPAP in calculating functional obsolescence. Because of these errors, BOTA's decision was unreasonable, arbitrary, and capricious and must be reversed. The parties provide extensive support for their competing positions in their briefs and ask us to adopt their position on functional obsolescence; however, it is not our role to calculate functional obsolescence. Rather, remand to BOTA for further proceedings is appropriate. Given the opposite conclusions each side advocates and BOTA's attempt to choose a middle ground, we emphasize that our holding does not compel BOTA to adopt one of the party's positions and that a figure somewhere in between 100 percent and 0 percent might be supported by the record in this case. On remand, BOTA would have to explain its rationale for supporting a figure in between the parties' positions; it would have to point to evidence in the record supporting its figure; and its rationale would have to be USPAP compliant.

## DID BOTA ERR IN CLASSIFYING 12.69 ACRES OF DRAINAGE AREA AS COMMERCIAL AND INDUSTRIAL?

Next, Kansas Star argues that BOTA improperly classified 12.69 acres of drainage as commercial and industrial, claiming the drainage area serves the agricultural land, not the casino. This dispute is significant because Kansas taxes land classified as devoted to agricultural use at a lower rate than land classified as commercial and industrial.

The Kansas Constitution provides for seven classes of real property: residential, agricultural, vacant lots, real property owned and operated by a not-for-profit, public utility, commercial and industrial, and other. Kan. Const. art. 11, § 1. Classification determines the assessment rate and, for land devoted to agricultural use, valuation methodology. The Kansas Constitution provides:

29

"Land devoted to agricultural use may be defined by law and valued for ad valorem tax purposes upon the basis of its agricultural income or agricultural productivity, actual or potential, and when so valued such land shall be assessed at the same percent of value and taxed at the same rate as real property subject to the provisions of section 1 of this article." Kan. Const. art. 11, § 12.

All nonagricultural land is valued at fair market value as defined in K.S.A. 2017 Supp. 79-503a, but land devoted to agricultural use is valued according to an income-based formula. K.S.A. 2017 Supp. 79-1439; K.S.A. 2017 Supp. 79-1476. Accordingly, whether land is devoted to agricultural use is a question of statutory interpretation over which we exercise unlimited review. *Unruh*, 289 Kan. at 1193.

Under K.S.A. 2017 Supp. 79-1439(b), taxing authorities are required to classify real property as one of seven classes and then assess taxes at a percentage specified by the statute. The burden of proof to establish proper classification of the subject property lies with the County. K.S.A. 2017 Supp. 79-1609.

In *In re Equalization Appeal of Camp Timberlake*, No. 111,273, 2015 WL 249846, (Kan. App. 2015) (unpublished opinion), the taxpayer argued that Johnson County erroneously classified his property as commercial instead of agricultural. On appeal, the *Camp Timberlake* panel held that the county had the initial statutory burden to prove the valuation of the property as commercial property, but the party asserting a different classification must come forward with evidence supporting its position. 2015 WL 249846, at *6-8. The panel also distinguished between the burden of proof of the classification of the property and the burden of production of affirmatively arguing for a different classification.

"The burden of proof is not to be confused with the burden of going forward with the evidence. The burden of proof is always on the party asserting an affirmative of an issue and remains with him throughout the trial. Even though it may be incumbent upon the

30

other party to proceed with the introduction of evidence at some stage of the proceedings, the burden of going forward with the evidence does not change the burden of proving a disputed issue.' [*Jenson*,] 205 Kan. at 467." *Camp Timberlake*, 2015 WL 249846, at *8.

Kansas Star bears this burden here.

Of the total acreage of the 195.5-acre tract, approximately 41.64 acres are set aside for drainage. Kansas Star agrees that about 28.95 of the drainages acres were properly classified as commercial property but contends the remaining 12.69 acres should have been classified as land devoted to agricultural use. The County classified the entire 195.5-acre parcel as commercial and industrial for tax year 2015.

BOTA considered the land used for drainage and storm water retention and concluded: "The Board finds that the need for these drainage areas is due to the commercial activities on the subject property, namely the buildings and parking lots. Furthermore, no agricultural activities take place on those areas. Therefore, those properties should remain classified as 'Commercial.'"

K.S.A. 2017 Supp. 79-1476 defines "land devoted to agricultural use" as "land, regardless of whether it is located in the unincorporated area of the county or within the corporate limits of a city, which is devoted to the production of plants, animals or horticultural products." There is no minimum size requirement or a requirement of a profit. *Board of Johnson County Comm'rs v. Smith*, 18 Kan. App. 2d 662, 666, 857 P.2d 1386 (1993). The use of the surrounding properties is not relevant. 18 Kan. App. 2d at 667.

Kansas Star concedes that the 12.69 acres are not used for farming. But it relies on a June 30, 1998 Division of Property Valuation (DPV) memorandum indicating that the

drainage should have been classified as nonproductive agricultural waste. However, the DPV memorandum relied on by Kansas Star was superseded by a later DPV memorandum issued on December 17, 2013, which clarified that "[w]aste is only appropriate within the classification of land devoted to agricultural use."

The County points to a May 15, 2013 DPV memorandum as additional support for its position that the land was properly classified as commercial. The DPV memorandum, titled "Classification of Non-Productive Land within a Single Agricultural Operation," addressed the issue of proper classification for nonproductive areas of a tract predominantly used for agriculture: "The non-use of a portion of a commercial building does not lead to a mixed-use classification, even though the non-used area can be clearly identified." The County extends this reasoning and argues that the 12.69 acres of drainage do not have to actively serve a commercial purpose in order to be classified as commercial.

Kansas Star points to evidence in the record about the slope of the property and information as to how the water drains. But the fact remains that the 12.69 acres are part of the commercial tract, not the tract leased for agricultural purposes. The County presented evidence of a casino operating on the portion of the property containing the drainage areas. Even though Kansas Star presented evidence that drainage came from the property subject to agricultural use, the County is not required to assign separate property classifications for portions of a property primarily used for commercial and industrial purposes.

Because the 12.69 acres of drainage is not part of the acreage leased for agricultural use, BOTA's conclusion that it should be classified as commercial and industrial is supported by substantial competent evidence.

32

## DID BOTA ERR IN CLASSIFYING 63.5 ACRES AS AGRICULTURAL?

The County argues that BOTA misapplied Kansas law by classifying 63.5 acres of the property as land devoted for agricultural use. It is undisputed that the 63.5 acres were leased to a farmer before the date of valuation, and he grew crops on the land in the year prior to and on the date of valuation. BOTA ruled that the acreage was properly classified as land devoted to agricultural use and appraised its value as $11,970 as stipulated to by the parties. Again, this dispute is significant because land classified as agricultural is taxed at a lower rate than land classified as commercial and industrial.

Real property is classified according to its use on January 1 of each year. For land devoted to agricultural use which has seasonal uses, the classification should be based annually upon the overall use during the prior year or operating period. See K.S.A. 2017 Supp. 79-1476; DPV Directive #99-038.

Under the Kansas Constitution, "[l]and devoted to agricultural use" is valued based on income production rather than the price a willing buyer would pay a willing seller (fair market value). Kan. Const. art. 11, § 1(a). However, the Kansas Constitution gave the Legislature the power to define what constitutes land devoted to agricultural use. Kan. Const. art. 11, § 12. The Legislature has defined agricultural land as land "devoted to the production of plants, animals or horticultural products." K.S.A. 2017 Supp. 79-1476. In interpreting the Legislature's use of the word "production," this court has concluded that the term "certainly suggest[s] that some activity must be taking place. The constitutional provision speaks of land *devoted* to agricultural use, and the statute speaks of land devoted to the *production* of agricultural goods." *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1115-16, 269 P.3d 876 (2012); see Kan. Const. art. 11, § 1(a); *In re Equalization Tax Appeal of Miami County Appraiser*, No. 106,659, 2012 WL 2149829, at *1 (Kan. App. 2012) (unpublished opinion).

33

In 1995, the Legislature specifically exempted from the definition of "land devoted to agricultural use"

> "those lands which are used for recreational purposes, other than that land established as a controlled shooting area pursuant to K.S.A. 32-943, and amendments thereto, which shall be deemed to be land devoted to agricultural use, suburban residential acreages, rural home sites or farm home sites and yard plots whose primary function is for residential or recreational purposes even though such properties may produce or maintain some of those plants or animals listed in the foregoing definition." K.S.A. 1995 Supp. 79-1476.

BOTA rejected the County's assertion that this exception applied to the leased acreage because there was no evidence that any recreational use was being made of the portions that were farmed.

The County identifies two cases in support of its position that BOTA erred in its ruling. First, in *In re Tax Protest of Jones*, 52 Kan. App. 2d 393, 367 P.3d 306 (2016), a taxpayer sought review of a BOTA decision upholding the County's residential classification of his entire 10.4-acre property that consisted of a residence and 9 acres used for growing hay. The taxpayer argued that pursuant to the applicable DPV directives, the County was required to separately classify the portions of the property that were put to different uses. The *Jones* panel disagreed, noting that regardless of DPV directives to the contrary, "K.S.A. 2013 Supp. 79-1476 specifically *excludes* from an agricultural classification suburban residential acreages or rural home sites . . . which have as their primary function a residential purpose." 52 Kan. App. 2d at 398.

Second, in *Flint Oak Ranch v. Elk County Comm'rs*, No. 72,316, unpublished opinion filed August 25, 1995, another panel of this court considered whether a portion of the taxpayer's 2,800-acre commercial hunting resort—used for raising game birds and growing grain to feed the birds—should have been separately classified as agricultural.

34

The panel concluded that it should not be classified as agricultural because K.S.A. 79-1476

> "clearly states that land is not devoted to agricultural use if it is 'used for recreational purposes' and its 'primary function is for . . . recreational purposes even though such properties may produce or maintain some of those plants or animals listed in the foregoing definition.' The language of the statute definitively excludes land whose primary function is recreational although the land is also used for agricultural pursuits." Slip op. at 6.

The County here asserts that—like the hunting resort in *Flint Oak Ranch*—there is no genuine dispute that the primary function of the 195.5-acre tract is commercial gaming, a recreational activity.

Kansas Star counters that these cases are distinguishable because the exception applies only when the uses are intermingled rather than distinct. In both *Jones* and *Flint Oak Ranch*, the properties had overlapping and intermingled uses. Here, the 63.5 acres devoted to agricultural use is separate and distinct from the acreage supporting the casino. Hardison has the sole legal right to occupy and farm the 63.5 acres. Kansas Star also relies on *Smith*, 18 Kan. App. 2d at 671, where a panel of this court held that commercial land developers were legally entitled to segment portions of their land and devote them to agricultural use even if the sole purpose of doing so was to reduce their property taxes.

We agree with Kansas Star on this point. The County seems to view the entire 195.5-acre tract as a whole and fails to recognize that a portion of the property has been leased. Kansas Star asserts the County has "skipped the general rule for mixed-use property classification and jumped right to the exception." DPV Directive #99-038 provides that property with multiple uses should be classified according to each use, but the directive also allows for an exception where such uses "are so intermingled as to defy

35

classifying identifiable, physical portions of the property." In that case, the predominant use dictates the classification of the intermingled use.

Parenthetically, we note that the Legislature modified K.S.A. 79-1476 subsequent to *Jones*. The statute now allows portions of suburban residential acreages, rural home sites, or farm home sites to be given a mixed-use classification and requires a county appraiser to determine the amount of the parcel which is used for agricultural purposes and value such parcel as land devoted to agricultural use. L. 2016, ch. 112, § 17. This further bolsters our view that unless a portion of the land devoted to agricultural use is so intermingled with some other use, that portion of the property can be taxed at the agricultural use value rate.

Here, the land does not have an intermingled use. The 63.5 acres leased for agricultural purposes are separate, distinct, and easily identifiable from the tract devoted to commercial use. The County appraiser, Cindy Magill, agreed that the 63.5 acres of leased land was devoted to agricultural use in 2014 and as of January 1, 2015. Magill was not aware of any gaming activity occurring on the farmed acreage.

Magill also agreed that a single tax parcel can have more than one use, and she agreed that the commercial and agricultural use areas of the subject property can be individually identified. Moreover, Magill conceded that her office classified other tax parcels in the county with mixed commercial and agricultural classifications when those pursuits were distinguishable. Multiple examples of such properties were identified during her testimony. For example, Magill acknowledged one instance where a company operates an elevator and farm ground on a 60.7-acre tract. In that case, 33.5 acres relating to the grain elevator are classified as commercial, while the remaining 27.2 acres are classified as agricultural. Magill admitted that more than half of this tract was predominantly commercial, but she assigned a mixed-use classification anyway.

The entire 195.5 acres of the property has a mixed use, and 63.5 acres are easily identifiable as land devoted to agricultural use. BOTA did not err in so classifying those acres.

## DID BOTA ERR IN VALUING THE LAND AT $76,500 PER ACRE?

The County argues that BOTA's land value of $76,500 per acre is not supported by substantial competent evidence in light of the record as a whole and is unreasonable, arbitrary, and capricious. The County focuses on two assertions: (1) BOTA's stated rationale in support of its conclusion is arbitrary; and (2) BOTA should have adopted the land purchase price as the only evidence of value. Kansas Star responds that the County is merely asking us to reweigh the evidence in its favor. We agree with Kansas Star.

The County's expert, Jortberg, testified that the $17 million purchase price—$86,957 per acre—was the best evidence of land value. Conversely, Kansas Star's expert, Jackson, separately valued the section of property he determined was for gaming purposes and considered the necessity of various adjustments such as market conditions, location, and utilities. Jackson asserted a land value of $76,500 per acre.

BOTA found Jackson's analysis more persuasive than Jortberg's, in part because Jackson considered a second Dodge City sale and the sale of the property for the Hollywood Casino in Kansas City. The County claims that neither of these transactions were arm's length transactions and points out that Jackson testified he did not emphasize either transaction in his analysis. The County also points to evidence distinguishing the Dodge City sale as comparable and asserts that the County's reasoning in adopting Jackson's conclusion was arbitrary and capricious.

"An agency's action is arbitrary and capricious if it is unreasonable, without foundation in fact, not supported by substantial evidence, or without adequate

determining principles." *Denning v. Johnson County Sheriff's Civil Service Board*, 46 Kan. App. 2d 688, 701, 266 P.3d 557 (2011), *aff'd* 299 Kan. 1070, 329 P.3d 440 (2014). The County does not dispute the fact that there is evidence in the record supporting Jackson's conclusion; rather, it attacks the credibility of that determination.

The County also criticizes BOTA's finding that Jackson's land value analysis was more persuasive because he made the proper adjustments to account for differences in time, size, amenities, and location. The County argues that BOTA's reliance on this fact was in error because Jackson's land value conclusion was based only on a 119.8-acre tract—he did not include the 12.69 acres of drainage area he thought should have been classified as agricultural—and not BOTA's 132 acres of commercial land.

Kansas Star counters that we should reject the County's criticism. First, the change from 119.8 acres to 132 acres is de minimus and would not have affected Jackson's adjustments. And even if adjustments were made, Kansas Star claims it would have resulted in a lower per-acre value because larger tracts tend to sell for less per acre. Thus, the effect would have been a lower overall price per acre for the subject property. There is no evidence cited by Kansas Star supporting this argument, but it seems reasonable that the change in per-acre value would be minimal.

Ultimately, we are unpersuaded by the County's arguments that BOTA's decision was unreasonable, arbitrary, or capricious. BOTA's land value conclusion of $76,500 per acre is supported by substantial evidence in the record. Any adjustment due to the classification of the drainage area as commercial property would have been insignificant.

DID BOTA ERR IN ADOPTING A 35% DEPRECIATION RATE?

The County also argues, but for different reasons, that BOTA's depreciation calculation is unsupported by evidence in the record as a whole. The County's position is

38

the extreme opposite of that of Kansas Star and asserts that the property suffers from no functional obsolescence—in this instance superadequacy—because KELA and the gaming contract entered into by Kansas Star require an arena and the other supporting facilities. As we have already explained in our analysis of Kansas Star's complaint on BOTA's treatment of depreciation—that depreciation should be at 100%—BOTA's decision is unsupported by the record as a whole. Remand is appropriate on this issue.

## DID BOTA ERR BY REJECTING THE COUNTY'S INCLUSION OF 12.5% ENTREPRENEURIAL PROFIT?

Finally, the County argues BOTA erred by rejecting the 12.5% entrepreneurial profit Jortberg included in calculating the replacement cost when new.

Entrepreneurial incentive is "the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project." The Appraisal of Real Estate, Appraisal Institute, 573 (14th ed. 2013). In explaining the concept of entrepreneurial incentive, the Appraisal Institute has stated that "any building project will include an economic reward (above and beyond direct and indirect costs) sufficient to convince an entrepreneur to take on the risk associated with that project in the market." The Appraisal of Real Estate, Appraisal Institute, 573 (14th ed. 2013). When using the cost approach of appraisal, the Appraisal Institute references a need to estimate "the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive or profit." The Appraisal of Real Estate, Appraisal Institute, 562 (14th ed. 2013).

BOTA rejected the County's 12.5% entrepreneurial profit figure, explaining that "due to the circumstances of the subject property being a build-to-suit, owner-occupied

property, any development costs are a part of the business rather than the real estate." BOTA also noted the evidence did not support Jortberg's figure.

The County notes the Appraisal Institute advises:

"Some appraisers also observe that entrepreneurial profit often represents a theoretical profit in build-to-suit, owner-occupied properties. The owner-occupant may consider any additional operating profit due to the property's efficient design to be an incentive. However, the entrepreneurial profit might only be realized years after the property is built when it sells to a similar owner-occupant at a premium because the property is suitable and immediately available, unlike new construction or conversion of a different property." The Appraisal of Real Estate, Appraisal Institute, 575 (14th ed. 2013).

In other words, entrepreneurial incentive is not realized upon the sale of property if the building value does not exceed the cost.

Jackson testified that even if entrepreneurial incentive were expected and added to reproduction cost, it had to be tested for depreciation and obsolescence. He explained:

"[E]ntrepreneurial profit is earned after the completion of the construction is done. And at that point if you have obsolescence, well, then now you have a property that is obsolete where it's not worth as much as the construction cost. So the first dollar of entrepreneurial profit would immediately be wiped out if there's any obsolescence present because that is indicative of the fact that the value is less than the cost to construct."

The County admits that Jortberg did not include specific data corroborating his conclusion that a 10-15% profit range was typical and merely asserts that Kansas Star presented no evidence to the contrary. But the burden is on the County to support its value, and the County points to no evidence in the record supporting its position that BOTA erred in rejecting its 12.5% figure for entrepreneurial incentive. Therefore, the

40

County has failed to show that BOTA's decision is not supported by substantial evidence or is otherwise unreasonable, arbitrary, or capricious.

CONCLUSION

In conclusion, we reject virtually all of the parties' challenges to BOTA's decision and, therefore, affirm BOTA's order in almost all respects, except as to the parties' claims regarding depreciation and functional obsolescence, particularly as it relates to superadequacy. On that issue, we find that BOTA's determination to apply a 35% depreciation rate for functional obsolescence is unsupported by the evidence contained in the record as a whole. Accordingly, we reverse BOTA on its functional obsolescence calculation and remand the matter to BOTA with directions to reconsider the issue of depreciation and functional obsolescence.

BOTA's final order is affirmed in part, reversed in part, and remanded with directions.