(277 P.3d 1135)
No. 102,565

IN THE MATTER OF THE EQUALIZATION APPEAL OF JOSEPH J. BROCATO, FOR THE YEAR 2008 IN JOHNSON COUNTY, KANSAS.

Opinion filed July 23, 2010.

*Kathryn D. Myers*, assistant county counselor, of Olathe, for appellant.

*Linda Terrill*, of Neill, Terrill & Embree, P.A., of Leawood, for appellee.

Before GREENE, P.J., MARQUARDT, J., and BRAZIL, S.J.

GREENE, J.: Johnson County (the County) appeals the Court of Tax Appeals (COTA) order that established a 2008 valuation for ad valorem tax purposes of real properties of Joseph J. Brocato, arguing that COTA's valuation is not adequately supported by the evidence. We agree that COTA's valuation is flawed, so we reverse and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

The subject property is a retail strip shopping center consisting of 17,948 square feet and located on the northwest corner of Quivira and 135th Street in Overland Park. The property has been divided for multiple tenants, but it has experienced a 50% vacancy since at least 2004. Both parties noted to varying degrees an access problem to the property from the north and from the west, and the taxpayer testified that all known steps had been taken to rent the vacant space. The County urged a value of $2,871,100 for the property, and the taxpayer opined that the value of the property should not exceed $1,794,800. COTA established the value at $2,225,000.

The County presented evidence through its valuation specialist, Linda Clark, who did not initially appraise the property for the County, but rather examined the work of others in her office and then supplemented that work with her own property observation and market study. There was no objection to her qualifications or her opinion of value. She relied exclusively on the income approach to value, testifying as to each input required for her income model. With the exception of a rent loss calculation, she used market data rather than actual data to determine the various inputs for her model.

For rental rate, Clark explained that market rent ranged from $12 to $20 per square foot, and the County utilized $16 in its initial valuation model. She believed that $16 was probably understated, however, noting that the actual rents provided by Brocato were in the range of $18 to $20.50 per foot. Based on her market study, Clark testified that the market rental rate for the subject property should have been $17, but she used $16 in her final model because

the County had not appealed the value determined at the County level.

For expenses, Clark explained that market expenses for comparable properties ranged from 70 cents to $2.65 per square foot. Although the taxpayer had provided some actual expense data to the County, Clark testified that that data was "rendered . . . relatively useless" due to the significant vacancy experienced by the property and the fact "these expenses would include what would typically have been paid by the tenants." Clark selected $1.25 per square foot for her expense input, based on "parameters . . . from market data."

For vacancy rate, Clark utilized 4% from her market study for retail strip centers and did not make any adjustment for the vacancy rate experienced by the subject property. She testified, however, that she allowed a rent loss adjustment to the final valuation indicator "below the line." The adjustment reflected a 45% additional vacancy and was based on the present value of 1 year of rent attributable to that additional vacancy, or a valuation reduction of $163,723.

For capitalization rate, Clark utilized 8.25% based on a comprehensive market cap rate study conducted by an independent appraiser. Neither the record evidence nor COTA's order challenges the use of this capitalization rate.

Brocato testified in his own behalf, offering a challenge to the County's inputs for the income approach to value and opining that the value of the property should not exceed $1,794,800. As to rental rate, Brocato stated that $16 per square foot was not appropriate and $14 would be more accurate based on his recent and postvaluation experience with some tenants who required a reduction as a condition of staying in the property. As to expenses, Brocato stated that $1.25 per square foot did not accurately reflect his costs, which he stated were $3.77 per square foot before taxes and tenant reimbursement. Although he did not dispute the County's capitalization rate, he stressed the problem with access to the property and provided a lengthy narrative to support the historic and chronic vacancy rate experienced on the subject property. The following is an excerpt from that testimony:

"Now, we have done everything to try to lease this property. Now, when I say everything, I've gotten on the phone, I've called every real estate company in Kansas City, you name them, from Kessinger/Hunter, to Block, to whoever. I've had contracts with Kessinger/Block, I've had—Kessinger/Hunter, I'm sorry. I've had contracts with Block, both sides, David Block side and Stephen Block side, to no avail. I put my own signs up there, to no avail. I called all real estate companies throughout the metro area and I told them that instead of giving them the 6% commission that is normally due on renting property, that I would pay 8%, provided that I had very little TI or very little free rent to give, and I would pay 10% on any TI—if I had no TI and had no free rent to give. As of yet, I have gotten zero response.

. . . .

"Now, getting down to our present situation. We have over 50% of the property vacant with no prospects of anybody renting at this time. And I've gone to the point that I went to a catering company, which is a successful catering company, which is not satisfied with their present location . . . .

"I offered this gentleman—his lease don't come due until the end of April. I offered him four months free rent to take over Entres Made Easy. . . . I cannot find a restaurateur to come in there and look at it or to—to consider it. I can't find a catering—caterer to look at it."

COTA's order concluded that the value of the subject property should be $2,225,000, which was established using the County's income model but plugging in two alternative inputs selected from Brocato's testimony. Yet, curiously, COTA also found Brocato's testimony "unsupported." COTA found:

"The Taxpayer's evidence consists of unsupported statements concerning his opinion of value. The County's evidence consists of market data of income and expense information taken from area landlords. Testimony from the Taxpayer supported the County's current rental rate in its income approach. However, the evidence indicates that the subject property is not the typical property as it is difficult to access and lease. The Court finds that the County has not fully considered this in its value. Consequently, the rental rate should be reduced to $14 per square foot. The evidence shows that $14 is a typical rate in the area. As for expenses, the evidence indicates that $3.77 per square foot is appropriate. This amount is the sum of the Taxpayer's expense of $3.37 per square foot for common area maintenance and 40 cents per square foot for insurance. Based on this income approach, the Court finds that the parcel with the improvement should be appraised at a rounded value of $2,225,000."

The County timely appeals.

## STANDARDS OF REVIEW

According to K.S.A. 2009 Supp. 79-1609, unless the taxpayer has failed to provide income and expense data for the 3 years preceding the appeal, the county has the burden to produce evidence to demonstrate the correctness of the valuation determination.

"With regard to any matter properly submitted to the court relating to the determination of valuation of residential property or real property used for commercial and industrial purposes for taxation purposes, it shall be the duty of the County appraiser to initiate the production of evidence to demonstrate, by a preponderance of the evidence, the validity and correctness of such determination except that no such duty shall accrue with regard to leased commercial and industrial property unless the property owner has furnished to the County or district appraiser a complete income and expense statement for the property for the three years next preceding the year of appeal. No presumption shall exist in favor of the County appraiser with respect to the validity and correctness of such determination."

Judicial review of orders of COTA is governed by K.S.A. 2009 Supp. 77-621. For purposes of this appeal, application of this statute requires the appellate court to grant relief if: (i) The agency has erroneously interpreted or applied the law, K.S.A. 2009 Supp. 77-621(c)(4); (ii) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure, K.S.A. 2009 Supp. 77-621(c)(5); (iii) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, K.S.A. 2009 Supp. 77-621(c)(7); or (iv) the agency action is otherwise unreasonable, arbitrary, or capricious, K.S.A. 2009 Supp. 77-621(c)(8).

K.S.A. 79-505 and K.S.A. 79-506 require that appraisal practice be governed by Appraisal Foundation, Uniform Standards of Professional Appraisal Practice (USPAP) (1992). *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, Syl. ¶ 4, 88 P.3d 242, *rev. denied* 278 Kan. 843 (2004). These standards are embodied in the statutory scheme of valuation, and a failure by COTA to adhere to them may constitute a deviation from a prescribed procedure or an error of law. 32 Kan. App. 2d at 735.

"Under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.*, an appellate court reviews an agency's factual findings to see whether substantial evidence supports them in light of the whole record, considering evidence both supporting and detracting from the agency's findings. This substantial-evidence standard evaluates the reasonableness of an agency's conclusion in terms of the evidence. Substantial evidence is such evidence as a reasonable person would accept as sufficient to support a conclusion."

"If a hearing officer has made credibility determinations regarding a witness who appeared in person before that hearing officer, the appellate court must consider any credibility determinations made by the hearing officer. If an agency head disagrees with those credibility determinations, that agency head should give reasons for disagreeing, and the appellate court would need to consider those reasons on appeal as well."

"The appellate courts do not reweigh the evidence or engage in de novo review of an agency's factual findings. But the appellate court must consider all of the evidence—including evidence that detracts from an agency's factual findings—when assessing whether the evidence is substantial enough to support those findings. So the appellate court must determine whether the evidence supporting the agency's decision has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion." *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, Syl. ¶¶ 1, 2, 3, 212 P.3d 239 (2009).

## Is COTA's Valuation Supported by Adequate Evidence?

The County challenges three aspects of COTA's valuation: (1) the decision is not based on evidence that is substantial when viewed in light of the record as a whole; (2) the decision is otherwise unreasonable, arbitrary or capricious; and (3) COTA has erroneously interpreted or applied the law.

Among the County's challenges to COTA's approach is the rental rate selected. COTA's use of $14 per square foot is supported only by Brocato's "unsupported" testimony regarding a postvaluation conversation he had with a tenant who threatened to move unless his rent was reduced to this amount. We also note that $14 is within the County's suggested wide range of rental rates for comparable properties, which was $12 to $20 per square foot. We are not persuaded, however, that a postvaluation date conversation between Brocato and a tenant or a rather arbitrary selection of any amount from within such a wide range of rates provides the substantial evidence to support COTA's rental rate when there is extensive

testimony in the record from the County's appraiser that the proper rate should be at least $16 to $17 per square foot, and the taxpayer's actual data establishes rental rates of $18.50 to $20 for the preceding year. We must conclude that a rental rate of $14 per square foot is not supported by evidence that is substantial when considered in light of the record as a whole.

The County also challenges COTA's selection of $3.77 for the expense input to the model, suggesting that COTA failed to consider that the property is currently leased on a net-net basis, which means that tenants must pay their pro rata share of certain expenses. We agree. The actual data provided by the taxpayer corroborates the County's claim that much of the total expense used by COTA was actually reimbursed pro rata by the taxpayer's current tenants. Use of actual expenses within an income approach to value, when the bulk of those expenses have been reimbursed by tenants, does not provide substantial evidence for this input to the valuation model. We note in passing, however, that the County's expense rate of $1.25 also appears to be unsubstantiated, because it assumed full occupancy and full reimbursement of typical reimbursable expenses without any recognition of the property's historic and chronic vacancy rate "above the line."

For these reasons alone, COTA's valuation determination must be reversed and remanded. Because remand is required, however, we must note other critical errors in COTA's valuation that have not been challenged by the County. No cross-appeal was filed by the taxpayer, so we are without the ability to direct any reduction in value, but we must simply note these errors in the interest of judicial economy and in order to assure that a perpetuation of the same errors on remand does not lead to further inequities or to another judicial review of COTA's order on remand.

Vacancy rate is intended to be an allowance for reductions in potential income attributable to vacancies and varies depending on the type and *characteristics of the physical property*, the *quality of current tenants*, the current and projected supply and demand relationships, and general and local economic conditions. Appraisal Institute, The Appraisal of Real Estate 489 (11th ed. 1996). According to USPAP, an appraiser of real property must analyze the

relevant economic conditions at the time of the valuation, including *market acceptability* and supply, demand, scarcity, or rarity. US-PAP Standards Rule 6-2(h) (1992). When necessary for credible assignment results, the appraiser must assess value by *potential earnings*, including rentals, expenses, interest rates, capitalization rates, and *vacancy data*. USPAP Standards Rule 6-5(a)(v) (1992). Finally, an appraiser must base the estimates of vacancy rates on reasonable and appropriate evidence. USPAP Standards Rule 6-5(b) (1992). These standards clearly contemplate due consideration of property-specific evidence in ascertaining the proper vacancy rate.

In applying its market vacancy measure of only 4%, the County did not carefully analyze the property-specific factors that affected the property's future income and expense streams. See Alex E. Sadler, *The Inherent Ambiguity of Commercial Real Estate Values*, 13 Va. Tax. Rev. 787, 806 (Spring 1994). In applying a 4% market vacancy rate without regard for the property's historic and chronic vacancies, the rate clearly failed to account for the actual reduction in potential income for the subject property. This was a failure to follow prescribed procedure required by USPAP. See K.S.A. 79-505. The County had the burden to support its valuation, and when the method by which it accounted for the vacancy rate is flawed, it has not met this burden.

The County's rent loss adjustment "below the line" is not the proper vehicle to adjust for such an egregious vacancy rate experienced on the subject property, and it has been improperly calculated by the County in any event. Rent loss adjustments "below the line" are intended to compensate for a known short term loss of rent due to a period prior to occupancy, between tenants, or necessary to tenant improvements prior to a new lease. See Appraisal Institute, The Appraisal of Real Estate 591-92. The court is unaware of any reliable and authoritative source on appraisal standards that recognizes an approach like that applied here. Where the evidence establishes a chronic and long-term vacancy problem with the property under appraisal, this must be accounted for in the vacancy rate—not as rent loss.

If a vacancy problem is believed to be short-term, perhaps a rent loss adjustment might achieve reliable results—but the extent and likely time frame for the vacancy rate must be based on competent evidence, and the calculation must be made for the entire time frame of the projected vacancy, not just the first year thereof. We note that the County's valuation form acknowledges this truism by allowing such an adjustment to be made for at least 5 years. Here, the County did not complete the form as intended and offered no support for a rent loss adjustment for only 1 year; no evidence suggested the property could be fully leased within 12 months of the valuation date. In fact, the County offered no evidence to dispute Brocato's extensive testimony as to chronic vacancy in the property.

The evidence here was unequivocal: this property has historically suffered extensive vacancy and there appears no prospect for any change in the foreseeable future. COTA is directed to redetermine the value of the subject property in accordance with prescribed procedure, USPAP standards, and not contrary to this opinion, including consideration and application of an accurate vacancy rate for this property.

Reversed and remanded with directions.