NOT DESIGNATED FOR PUBLICATION

No. 117,406

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
KANSAS ENTERTAINMENT, L.L.C.,
for the Tax Year 2015 in Wyandotte County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed December 21, 2018. Affirmed.

*Linda Terrill*, of Property Tax Law Group, LLC, of Overland Park, for appellant/cross-appellee Kansas Entertainment, L.L.C.

*Jarrod C. Kieffer* and *Christina J. Hansen*, of Stinson Leonard Street LLP, of Wichita, for appellee/cross-appellant Wyandotte County.

Before MCANANY, P.J., PIERRON and LEBEN, JJ.

PER CURIAM: Kansas Entertainment, L.L.C. (Taxpayer) appeals from the ruling by the Kansas Board of Tax Appeals (BOTA) establishing the ad valorem valuation of the Taxpayer's real property in Kansas City for the 2015 tax year.

The Hollywood Casino is located on the Taxpayer's property, which is situated on the edge of the Kansas Speedway. The property consists of two parcels that comprise one economic unit. The relevant valuation date is January 1, 2015. The Taxpayer sought review by BOTA under K.S.A. 2017 Supp. 79-1609.

1

BOTA conducted an evidentiary hearing, at which the Unified Government of Wyandotte County/Kansas City, Kansas (Unified Government) bore the burden of proof. The Unified Government claimed that the fair market value of the property was $157 million. This valuation was based on an appraisal performed by Suzanne Mellen and Shannon Okada, both appraisers for HVS Consulting and Valuation Services, an appraisal and consulting firm that caters to the hospitality industry. The Unified Government also presented testimony from Kevin Bradshaw, supervisor of the commercial real estate section in the Wyandotte County Appraiser's Office. The Taxpayer relied on the testimony of its retained valuation expert, David Lennhoff, who opined that the fair market value of the property was only $68.6 million.

Following BOTA's evidentiary hearing, BOTA determined that the income methodology was the best method to determine the value of the property. BOTA generally adopted Lennhoff's income approach, under which the total going concern was valued and then allocated to real, personal, and intangible property. But BOTA made a few changes to Lennhoff's calculations—substituting values for 2014 anticipated revenue and earnings before interest, tax, depreciation, and amortization (EBITDA)—and valued the property at $102 million. The Taxpayer's petition for judicial review and the Unified Government's cross-petition bring the matter to us.

On appeal, the Taxpayer contends that BOTA erred by modifying Lennhoff's appraisal by using values with no evidentiary support and with little explanation. The Taxpayer argues that BOTA's adjustments are not supported by substantial evidence and are therefore unreasonable, arbitrary, and capricious.

The Unified Government filed a cross-petition for review, arguing: (1) BOTA erred in holding that Lennhoff's income allocation approach was a better indicator of value than Mellen's management fee approach; and (2) BOTA erred in adopting a

2

valuation approach that relied on evidence that BOTA previously ruled was irrelevant and undiscoverable.

Because BOTA's decision is based on substantial competent evidence, because BOTA did not commit reversible err in adopting the methodology of the Taxpayer's expert over that of the Unified Government's expert, and because the Unified Government has failed to show that including the selling price of one particular casino owned by a Real Estate Investment Trust (REIT) in the data set of casino sales transactions significantly altered BOTA's decision, we affirm.

*The Property*

One of four state-sponsored gaming enterprises in Kansas authorized under the Kansas Expanded Lottery Act (KELA) is located on the property. See K.S.A. 2017 Supp. 74-8733 et seq. In 2007, the Legislature passed KELA, which divided the State into four "gaming zones"—northeast, south central, southwest, and southeast—and authorized the Kansas Lottery to operate a single gaming facility in each zone. K.S.A. 2017 Supp. 74-8734(a), (d), and (h)(17). Wyandotte County is in the northeast gaming zone. K.S.A. 2017 Supp. 74-8702(f). The State has set minimum infrastructure investment requirements for proposed casino projects. The statutorily required minimum investment in the northeast gaming zone is $225 million. K.S.A. 2017 Supp. 74-8734(g)(2). The State also required the installation of a minimum of 2,000 slot machines in the casino.

Hollywood Casino, located on 101 acres of land, opened in February 2012. The approximately 245,000-square foot building includes a Las Vegas-style casino with a 94,444-square foot gaming floor; a steak house, buffet, sports bar, mid-level restaurant, coffee shop, and VIP lounge; office and administrative space; 1,253 covered parking

spaces; and additional surface parking. The casino floor has 2,000 slot machines, 40 banked gaming tables, and 12 poker tables.

The property is situated in the Village West retail development area next to the Kansas Speedway in Kansas City. Village West is located at the intersection of I-70 and I-435 in Wyandotte County. The Kansas Speedway and the Village West development have transformed the area into a major tourist destination that attracts approximately 10 million visitors annually.

Hollywood Casino's primary competition includes four full-service riverboat casinos in the Kansas City area. Hollywood Casino's competitors have food and beverage amenities, but according to the Unified Government's expert, Hollywood Casino's restaurants are generally of higher quality. Hollywood Casino is designed to "cater to high-end players in addition to mass players." In its valuation report, HVS described Hollywood Casino as "state of the art," and offering a "sophisticated, contemporary, and inviting atmosphere."

*BOTA Proceedings*

    1. *Suzanne Mellen, the Unified Government's appraisal expert*

Suzanne Mellen is employed by HVS as the Senior Managing Director of the Consulting and Valuation Division and President of the Gaming Services Division. Mellen has the MAI, CRE, and FRICS appraisal designations. She is also a member of the International Society of Hospitality Consultants and a fellow of the Cornell Center for Real Estate and Finance. Mellen has written and lectured on many hospitality property related topics and specializes in appraising hospitality-related assets, including hotels, casinos, resorts, and arenas. David Lennhoff, the Taxpayer's expert, recognizes Mellen as

a leading expert in the field of casino appraisal. Mellen and HVS have appraised casinos in nearly every United States jurisdiction, internationally, and for a wide variety of purposes. Shannon Okada, also an employee of HVS, helped prepare the valuation report.

Using the income approach, Mellen: (1) projected revenue and operating expenses for the property; (2) deducted a management fee to remove any intangible property value; (3) deducted a reserve for replacement to allow for a return of personal property; (4) capitalized the income stream through both (a) an earnings before interest, tax, depreciation, and amortization (EBITDA) multiplier process and (b) a 10-year discounted cash-flow analysis; and (5) subtracted the value of personal property to arrive at a real estate value of $157 million.

As a part of her analysis, Mellen forecasted nongaming revenue and expenses using the best available data in the absence of Hollywood Casino's actual financial information. She projected the casino's EBITDA would be $33,993,000 (23.2%) for 2015, $33,539,000 (22.9%) for 2016, then modestly increasing in future years, and stabilizing at a 22.7% EBITDA margin.

On this point, the Unified Government had formally requested detailed financial information for the subject property in July 2015, a year before the BOTA hearing. Following two motions to compel and several rounds of supplemental production, the Taxpayer finally produced the financial information a couple of months before the evidentiary hearing. The production of documents came too late for Mellen to prepare a revised report, but Mellen indicated that if she had received the financial information sooner, "it is highly likely that we would have forecast a higher EBITDA margin" because "the financial statements indicate that this is a more profitable operation than we had . . . forecasted in our appraisal."

In concluding her analysis, Mellen reconciled the income and cost approaches to value to arrive at a real and personal property value of $187 million. Following the management fee methodology, she reduced the real property and tangible personal property value of $187 million by approximately $30 million, resulting in a final valuation under the income approach of $157 million.

2. *David Lennhoff, the Taxpayer's appraisal expert*

Lennhoff has earned six of the seven designations offered by the Appraisal Institute and is a nationally recognized expert in the Uniform Standards of Professional Appraisal Practice (USPAP). His practice is devoted to complex appraisal issues. Some examples include being retained as a methodology expert and review appraiser of the Flight 93 crash site for condemnation; valuing the Gettysburg Tower at the Gettysburg National Battlefield Park on behalf of the Department of Justice; and appraising the Alaska Pipeline. He has experience in casino appraisal, having appraised the Kansas Star Casino twice and two other out-of-state casinos.

Like Mellen, Lennhoff chose the income approach as the best method for appraising the subject property. The income approach for a casino property combines the income and sales comparison approaches to find a value for the underlying real estate alone.

For his income approach, Lennhoff used an allocation approach in which he estimated the value of the total business enterprise and then allocated a percentage of the total value to the real property.

Lennhoff's calculation began with the subject property's 2014 total annual revenue of $143,390,489. He used this number because of his finding that the revenue "has sort of

6

plateaued." He conceded that Hollywood Casino showed increases of 4.86% in 2013 and 2.42% in 2014, but he weighed that against the fact that the overall Kansas City gaming revenues decreased approximately 2.7% year-over-year in both 2012-13 and 2013-14.

Next, relying on information concerning broad averages of national and international casino operators, Lennhoff estimated a market EBITDA margin of 20%.

Next, Lennhoff determined the EBITDA multiplier, which he extracted from 12 sales of casino going concerns. The EBITDA multipliers from those transactions ranged from 7.16 to 8.82, with a median of 7.68 and an average of 7.78. Lennhoff arrived at an EBITDA multiplier of 7.75 based on casino sales across the country, settling on a number roughly at the midpoint of the data set and giving the greatest weight to the most recent transactions in the industry.

Using this total annual revenue, EBITDA margin, and EBITDA multiplier, Lennhoff determined a total business enterprise value of approximately $222 million.

The final step in the income approach is to determine how much of the value of the total assets of the business is attributed to real estate and separate that value from other business assets. Lennhoff considered three sources to determine how much of the casino's value was attributable to the real estate: (1) studies of casino sales; (2) analyses of similar property types and the contribution to value made by the real estate in those situations; and (3) an analysis of 10K filings by similar businesses.

Lennhoff reviewed: (1) a study by William Kinnard regarding separating real property from the business; (2) racetrack sales with or without flagship races; and (3) purchase price allocations of casino property in transactions across the country. The study of casino property transactions showed that the real property contributed between 23%

and 38% of the total value. Lennhoff concluded that in this case 30% of a casino's value is attributable to the real property. From this he derived a real property valuation of $66.7 million.

Lennhoff then assigned an 80% weight to his income allocation approach "because it better answers the question" of how much the real estate contributes to the assets of the business. He concluded that a reconciled value of the fee simple interest in the real estate was $68.6 million.

### 3. *Scott Biethan, the Unified Government's appraisal review expert*

Scott Biethan, CBRE Hotels consulting and gaming services expert, conducted an appraisal review. He testified that Lennhoff's income approach was incorrectly performed for several reasons. First, Lennhoff took Hollywood Casino's 2014 revenue as the starting point for an EBITDA reconstruction and failed to account for the trend of increasing revenues:

> "The area of disagreement is that when I reviewed and looked at his report, I see that net revenues from 2012 through 2014 have been increasing and—you know, and I heard the testimony and discussion around his thoughts of the market, but there was not a—a detailed analysis of the subject property related to the market and where those revenues might be in 2015.
> "And, you know, as we understand, you know, buyers and [sellers] and market participants, they're really looking at a forward number, and that's very important. And when the property has been trending forward historically, the question of why you would not have considered a—a higher number on a going forward basis is a question that I didn't—that I didn't see answered nor would I agree with just leaving it flat. I would have, you know, thought there would have been a lot more consideration to growing the revenue in 2015 to use as the basis for the income approach."

8

Second, Biethan did not agree with the 20% EBITDA margin used by Lennhoff, noting that it jumped out at him as low and unsupported. Lennhoff selected 20% based on his review of a number of broad averages of public information regarding various gaming companies. Biethan thought Lennhoff should have gathered specific data to compare the style of casino, market conditions, and the location to support his EBITDA margin.

Finally, Biethan took issue with Lennhoff's 30% allocation to the real estate, explaining that the allocation to real estate is not widely used as a method to appraise property in the gaming industry.

4.  *Projected revenue and economic concerns*

The parties disagreed about the projected revenue and economic forecast for the Hollywood Casino. The Unified Government pointed to evidence showing a projected growth in revenue. But the Taxpayer highlighted evidence showing a saturated market with little room for economic growth.

From its opening in 2012 through fiscal year 2015, this casino increased its revenue and profits each year. Moreover, its EBITDA and EBITDA margin both increased annually every year for the first three years of operation. Its fiscal year ends on June 30 each year, so fiscal year 2013 includes figures for the last half of 2012. Its actual net revenues from 2013 to 2015 are:

- $133,253,000 in 2013,
- $140,771,000 in 2014, and
- $151,453,000 in 2015.

The property had actual EBITDA margins of 29% in 2013, 31.1% in 2014, and 32.9% in 2015. The Taxpayer projected further EBITDA margins of 33.3% for 2016 through 2018.

The casino's financial data through fiscal year 2015 and projections through 2018 show that revenues were increasing and that trend was expected to continue. In a forecasted statements of operations, the Taxpayer represented the projected income of the casino as follows:

- $156,611,000 for 2016,
- $159,847,000 for 2017, and
- $161,445,000 for 2018.

Hollywood Casino's increase in revenue and projected increase contrasted with the overall Kansas City gaming market which experienced a general post-recession decline, interrupted only by a one-year increase of 7% due to the opening of the Hollywood Casino in 2012. Mellen explained that Hollywood Casino's market share had increased in a relatively saturated market by taking demand from the other casinos in the area.

In contrast, Lennhoff testified that the overall conditions for gaming on a national level are not very good, with national forecasts showing a "saturated flat" market with very little increase.

*BOTA's Decision*

BOTA issued a summary decision in which it found the methodology used by Lennhoff to be the best method of determining the fair market value. The Unified Government requested a full and complete opinion under K.S.A. 2017 Supp. 74-2426(a).

10

In the complete opinion that followed, BOTA explained that it found the Lennhoff appraisal to be the "best indicator of value as it is the best methodology presented for determination of the subject real estate value." BOTA accepted Lennhoff's EBITDA multiplier of 7.75% and his conclusion that the real estate makes up 30% of the value of the total assets of the business. But in adopting Lennhoff's approach, BOTA made two changes to Lennhoff's calculations.

First, BOTA rejected Lennhoff's forecast of net revenues and instead found Mellen's 2015 revenue estimate of $146,254,000 to be more accurate. BOTA explained: "Lennhoff failed to project any increase in the Taxpayer's total revenue. This is at odds with the Taxpayer's actual revenue that has been increasing annually. Therefore, we find Mellen's 2015 total revenue determination to be more accurate than that sponsored by Lennhoff."

Second, BOTA found Lennhoff's EBITDA margin of 20% "inconsistent" with the casino's actual performance. Mellen estimated an EBITDA margin in her 10-year discounted cash-flow approach of 27.5% to 27.9%. But Mellen testified that if she had received all of the figures requested in discovery at the time she prepared her valuation, she would have increased the EBITDA margin a little. The property had actual EBITDA margins of 29% in 2013, 31.1% in 2014, and 32.9% in 2015. BOTA placed "primary weight" on the property's actual performance and adopted an EBITDA margin of 30%.

After applying these inputs to Lennhoff's methodology, BOTA concluded the 2015 appraised value of the subject property was $102 million.

11

*Motions for Reconsideration*

The Taxpayer filed a motion for reconsideration under K.S.A. 2017 Supp. 74-2426(b). It claimed that BOTA erred in selecting "bits and pieces from the Mellen Method." It asked BOTA to reconsider and adopt Lennhoff's appraisal in full, with an appraised value of the real estate of $68.6 million.

The Unified Government also filed a motion for reconsideration, asserting that BOTA's conclusion that the Lennhoff allocation approach is the "best indicator of value" was erroneous and directly conflicted with its prior discovery ruling that sales data held by a nonparty Real Estate Investment Trust (REIT) was irrelevant to valuing the subject property.

BOTA denied both motions for reconsideration. With regard to the Unified Government's argument that BOTA's prior discovery ruling was inconsistent with its conclusion, BOTA noted that it denied the Unified Government's motion due to relevance and noted that the discovery request was directed to nonparties to this action. BOTA noted that the scope of discovery differs significantly between parties and nonparties, and the Kansas Rules of Civil Procedure do not apply to nonparties. See *In re Cusumano*, 162 F.3d 708, 717 (1st Cir. 1998); *Bio-Vita, Ltd. v. Biopure Corp.*, 138 F.R.D. 13, 17 (D. Mass. 1991).

BOTA also rejected the Taxpayer's position that it must adopt an appraisal in its entirety. BOTA reaffirmed its decision to adjust Lennhoff's method by using two figures to make an adjustment to value. It noted that BOTA is required to render decisions based on substantial competent evidence in light of the record as a whole, and it is "duty bound" to "implement warranted adjustments when supported by substantial credible evidence."

12

The Taxpayer filed a petition for judicial review, and the Unified Government filed a cross-petition for judicial review under K.S.A. 2017 Supp. 74-2426(c)(4)(A), which permits a review of BOTA's decision by the Court of Appeals without prior judicial review by the district court.

*Standards of Review*

In this review our role is not to conduct a de novo examination of the fair market value of the subject property for ad valorem tax purposes. Instead, we review BOTA's decision in the manner prescribed by the Kansas Judicial Review Act (KJRA), K.S.A. 2017 Supp. 77-601 et seq., which defines the scope of review of state agency actions. See K.S.A. 2017 Supp. 74-2426(c).

The Unified Government bears the burden of proof before BOTA under K.S.A. 2017 Supp. 79-1609. But on appeal, the burden of proving the invalidity of the agency's actions and decision is on the party asserting the invalidity. K.S.A. 2017 Supp. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016). Further, when reviewing an agency action as set forth in K.S.A. 2017 Supp. 77-621(c), we take into account the rule of harmless error. K.S.A. 2017 Supp. 77-621(e); *Sierra Club v. Moser*, 298 Kan. 22, 47, 310 P.3d 360 (2013).

In our review, we construe tax statutes strictly in favor of the taxpayer. See *In re Tax Appeal of Harbour Brothers Constr. Co*., 256 Kan. 216, 223, 883 P.2d 1194 (1994); *In re Tax Protest of Jones*, 52 Kan. App. 2d 393, 396, 367 P.3d 306 (2016), *rev. denied* 305 Kan. 1252 (2017). The interpretation of a statute is a question of law over which we have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). In reviewing Kansas statutes, we no longer defer to the agency's interpretation. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013);

*In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 472, 239 P.3d 96 (2010). But this principle applies only to the interpretation of statutes.

Under K.S.A. 2017 Supp. 74-2426(c), BOTA is an agency subject to KJRA review. Under the KJRA, K.S.A. 2017 Supp. 77-621(c) sets out eight standards under which an appellate court may grant relief. In this case, the parties are relying on K.S.A. 2017 Supp. 77-621(c)(4), (c)(7), and (c)(8) to support their argument that relief should be granted. See *In re Tax Appeal of Brocato*, 46 Kan. App. 2d 722, 727, 277 P.3d 1135 (2010).

- K.S.A. 2017 Supp. 77-621(c)(4) requires us to grant relief if the agency erroneously interpreted or applied the law.

- K.S.A. 2017 Supp. 77-621(c)(7) allows us to grant relief if the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in the light of the record as a whole. "[I]n light of the record as a whole" includes evidence both supporting and detracting from an agency's finding. K.S.A. 2017 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84 239 P.3d 66 (2010). To be substantial competent evidence, the evidence must provide a substantial basis in fact from which the issues can be reasonably determined. *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009). To find that a decision is not supported by substantial evidence requires that the decision be "so wide of the mark as to be outside the realm of fair debate. [Citation omitted.]" *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 137, 275 P.3d 56 (2012). We are specifically instructed not to "reweigh the evidence or engage in de novo review." K.S.A. 2017 Supp. 77-621(d).

14

- Finally, K.S.A. 2017 Supp. 77-621(c)(8) requires us to grant relief if BOTA's action is otherwise unreasonable, arbitrary, or capricious.

*The Taxpayer's Contentions on Appeal*

The Taxpayer agrees with BOTA's decision to adopt Lennhoff's income approach methodology as the better way to arrive at a value for the subject property. But the Taxpayer argues that BOTA erred when it made two adjustments to Lennhoff's appraisal by using two different values that increased Lennhoff's estimate of value. The Taxpayer asserts this adjustment is not supported by substantial evidence and is otherwise unreasonable, arbitrary, and capricious.

BOTA found Lennhoff's income approach represented the "best indicator of value." It found Lennhoff's methodology to be "more comprehensive and compelling than that of County expert witness Suzanne [Mellen]." But BOTA made two adjustments to Lennhoff's income approach by using different values for (1) the casino's anticipated revenue and (2) its EBITDA margin.

Lennhoff used actual revenue of $143,390,489. He estimated the EBITDA margin to be 20% based on an industry-wide survey of average profits for casino operators. Finally, he extracted an EBITDA multiplier of 7.75 from a nationwide sampling of casino sales, using roughly the midpoint of the data set and giving the greatest weight to the "most recent transactions in the industry."

Both parties agree that the casino revenues and the EBITDA margin are factors to be considered when appraising the fair market value of the casino. Both appraisers use the casino's revenues as the starting point for their income approaches. The issue before

15

us is whether BOTA erred in modifying Lennhoff's valuation by using its own values for expected revenue and the EBITDA margin in order to reach its own valuation of the real property. BOTA explained its reasoning for these modifications:

> "In his income approach, however, Lennhoff failed to project any increase in the Taxpayer's total revenue. This is at odds with the Taxpayer's actual revenue that has been increasing annually. Therefore, we find Mellen's 2015 total revenue determination to be more accurate than that sponsored by Lennhoff. Further, Lennhoff's EBITDA margin of 20% is inconsistent with the Taxpayer's actual performance. Mellen determined an EBITDA margin in her 10 year discounted cash flower approach of 27.5% to 27.9%. Further, the subject property had an actual EBITDA margin of 31% in 2014 and 33% for 2015, with forecasted EBITDA margins of 33% for years 2016 to 2018. Giving primary weight to the subject property's actual performance, we find an EBITDA margin of 30% is in order."

The Taxpayer takes issue with BOTA's findings, noting that BOTA is charged with separately stating findings of fact, conclusions of law, and the reasons for its decision. See K.S.A. 77-526(c). But BOTA is not required to render the explanation for its findings in detail so long as the explanation is "specific enough to allow judicial review of the reasonableness of the order." *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988); *Rhodenbaugh v. Kansas Employment Sec. Bd. of Review*, 52 Kan. App. 2d 621, 631, 372 P.3d 1252 (2016) (explaining that under K.S.A. 77-621, the court must "review the agency's explanation as to why the evidence supports its findings"), *rev. denied* 306 Kan. 1319 (2017).

BOTA did not change Lennhoff's valuation formula, it merely applied different values into the formula for projected revenue and the EBITDA multiplier. In its decision, BOTA provided a reason for each of the modifications:

16

- BOTA stated that it rejected Lennhoff's revenue projection of $143,390,489 because he did not account for an increase in revenue despite the fact that revenues had increased each year and were projected to increase in fiscal year 2015. Thus, BOTA found Mellen's 2015 revenue projection of $146,254,000 to be more accurate.
- BOTA adopted an EBITDA margin of 30%, which was higher than the number relied on by either appraiser. But BOTA explained that it based its number on actual and forecasted EBITDA multipliers for the Hollywood Casino.

Finding BOTA's reasoning clear, our role is to determine whether each of these modifications is supported by substantial competent evidence in the record. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 891-92, 214 P.3d 707 (2009) (upholding BOTA's adjustment for freezer space/cooler space that was not accounted for in the appraisal). Our task is not to reweigh evidence. We will uphold findings that are supported by substantial evidence even though evidence in the record supports contrary findings. *Chowning v. Cannon Valley Woodwork, Inc.*, 32 Kan. App. 2d 982, 987, 93 P.3d 1210 (2004). As noted earlier, for a decision to lack substantial competent evidence, it must be "so wide of the mark as to be outside the realm of fair debate." *Dillon Stores*, 42 Kan. App. 2d at 889.

The law does not require BOTA to adopt either party's appraisal in full so long as there is evidence in the record to support BOTA's adjustments. In *Dillon Stores*, BOTA made an upward adjustment to the taxpayer's appraisal because it failed to adequately account for the value of the freezer/cooler space. A panel of this court affirmed BOTA's ruling even though the taxpayer had not asked for the adjustment, reasoning that the adjustment was derived from information contained in the record. 42 Kan. App. 2d at 888-89.

17

The USPAP valuation standards are a part of our statutory valuation scheme, and BOTA's failure "to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Dillon Stores*, 42 Kan. App. 2d at 890. In *In re 2013 Equalization Appeal of Kansas Star Casino*, No. 115,587, 2018 WL 2748748, at *10 (Kan. App. 2018) (unpublished opinion), the appellant complained that BOTA picked values from the competing valuation reports "without providing expert testimony to establish the proper relationship between the data points." A panel of our court concluded that BOTA was not required to adopt either party's appraisal report in full provided that any adjustment to value is supported by evidence in the record. 2018 WL 2748748, at *11.

Here, BOTA adopted Lennhoff's methodology, and neither party has effectively argued how a substitution of the two values—projected revenue and EBITDA margin— invalidated the methodology or deviated from the USPAP standards. Because there is nothing in the record to indicate—nor does either party argue—that BOTA's adjustments violated USPAP standards, we find BOTA did not err in adjusting these values provided that the adjustments are supported by substantial evidence.

BOTA found Lennhoff's projected revenue to be too low. It based its reasoning on the fact that the casino's revenue had increased every year, and Lennhoff's projected revenue did not account for an increase in revenue. Instead, BOTA adopted Mellen's 2015 projected revenue number. This modification is clearly supported by evidence in the record.

The record also supports BOTA's modification to the EBITDA margin. BOTA specifically rejected Lennhoff's EBITDA multiplier of 20% as too low because it was not consistent with the casino's actual performance. Mellen estimated the EBITDA margin to

18

be in the range of 27.5% to 27.9%. But Mellen did not receive all of Hollywood Casino's financial information until well after she completed her valuation report. At the hearing, Mellen testified that she would have projected a higher EBITDA margin if she had received Hollywood Casino's full financial information at the time of her valuation. She testified:

"[T]he income and expense statements that we received of the subject property reflect a modestly higher gaming revenue that we had projected. But the most market contrast to our own projections of what the subject property—how the subject property has been performing, because we had no—really, no basis to understand exactly how this hotel is performing, that it's significantly more profitable than we had projected. We were projected at 27 percent EBITDA and this property is throwing about a 33 percent EBITDA margin, and that makes for a significant different in EBITDA and net income available to be generated by the property."

Biethan criticized Lennhoff's valuation primarily because he thought the forecasted revenue and EBITDA margin were too low. Biethan's testimony supports the adjustments that BOTA made to Lennhoff's values.

The property had actual EBITDA margins of 29% in 2013, 31.1% in 2014, and 32.9% in 2015. BOTA placed "primary weight" on the property's actual performance and adopted an EBITDA margin of 30%. This modification to the EBITDA margin is supported by evidence in the record.

In *In re 2014 Equalization Appeal of Kansas Star Casino*, No. 116,421, 2018 WL 2749734 (Kan. App. 2018) (unpublished opinion), the income allocation approach to value used by Lennhoff and approved by BOTA was the same methodology used here. A panel of this court did not explicitly rule on the methodology because it found no support for BOTA's decision to use median numbers from the information in both appraisals. The

court found BOTA's method to be its "version of splitting the baby." 2018 WL 2749734, at *19. The court rejected BOTA's figures and agreed with the Unified Government's argument that "BOTA seems to have selected figures out of thin air and provided no explanation for its 21% profit margin." 2018 WL 2749734, at *20.

In contrast, the adjustments made to Lennhoff's methodology in our present case are supported by evidence in the record. BOTA did not change Lennhoff's method. It merely used different values in the same formula relied on by Lennhoff to reach the valuation of the property. BOTA did not rely on arbitrary or median numbers to determine revenues or the EBITDA margin. Rather, the record contains substantial evidence, in light of the record as a whole, in support of BOTA's adjustments. Additionally, the parties have not shown that BOTA acted arbitrarily or unreasonably in adjusting the final valuation of the subject property.

*The Unified Government's Contentions in its Cross-Appeal*

In its cross-appeal, the Unified Government first argues that BOTA erred in not adopting Mellen's management fee approach over Lennhoff's approach to value.

When reviewing whether a decision by a fact-finder is supported by substantial competent evidence, we do not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts of evidence. *In re Guardianship & Conservatorship of Burrell*, 52 Kan. App. 2d 410, 419, 367 P.3d 318 (2016); see K.S.A. 2017 Supp. 77-621(d). Thus, we will uphold findings that are supported by substantial evidence even though there is evidence in the record that supports contrary findings. *Chowning*, 32 Kan. App. 2d at 987.

20

The Unified Government complains that BOTA adopted Lennhoff's approach without any clear rationale. But in adopting Lennhoff's approach, BOTA stated that Lennhoff's approach was "more comprehensive and compelling" than Mellen's approach. It noted that Lennhoff's income approach methodology, with warranted adjustments, was "the best indicator of value as it is the best methodology presented for determination of the subject real estate value." On appeal, the Unified Government has the burden to show that BOTA's decision to adopt Lennhoff's approach is not supported by the evidence, is contrary to law, or is arbitrary and capricious.

Both parties agree with BOTA that the primary challenge in this case "lies in properly distilling the market value for the subject real estate from the market value of the business enterprise/going concern." This is a challenging task because casinos are rarely sold as business enterprises separate and apart from the underlying real estate. Rather, they are sold as going concerns with the underlying real estate included in the sale price.

Several approaches can be used to separate intangible ongoing business values from the real and personal property values. Those approaches include: (1) the cost approach; (2) the management fee approach; (3) the market participant survey approach; and (4) the parsing of income approach. The Appraisal of Real Estate, Appraisal Institute, 711-13 (14th ed. 2013). Both parties here relied on an income approach: Mellen used the management fee approach and Lennhoff relied on the income capitalization approach. Mellen's management fee approach is known as the Rushmore model.

"The Rushmore model is a method of valuing hotels. It was developed in Hotels and Motels: A Guide to Market Analysis, Investment Analysis, and Valuations, a book written by Stephen Rushmore, MAI, published in 1992. The book is now published by

21

the Appraisal Institute." *Marriott Corp. v. Board of Johnson County Comm'rs*, 25 Kan. App. 2d 840, 843, 972 P.2d 793 (1999).

The Unified Government provides two main reasons for its position that BOTA erred in adopting Lennhoff's approach: (1) Mellen's approach was superior for determining fair market value; and (2) Lennhoff's approach was flawed and required adjustments.

In support of Mellen's approach, the Unified Government claims:

- The management fee approach—which operates under a theory that the subtraction of the management fee removes all intangible value—is the generally accepted method of valuing hospitality properties among appraisers and courts;

- Lennhoff's approach is the source of much controversy, with critics asserting that Lennhoff's method is designed to minimize real estate value and lessen property tax appeals;

- Lennhoff did not use the same approach in his appraisal of the Kansas Star Casino; and

- The management fee approach is the preferred method of appraising hotel properties in Kansas.

In its appellate brief the Unified Government gives a detailed analysis of the two approaches, compares the approaches, and concludes that Mellen's approach is the superior method. In comparing Mellen's Rushmore approach to Lennhoff's approach to value, the Unified Government argues that "Rushmore developed what is now *a* widely-accepted approach for valuing the real property components of hospitality properties." (Emphasis added.) Mellen testified that her approach "has become the commonly

22

accepted approach" in casino valuations. According to the Unified Government, "[f]or decades, courts have recognized the Management Fee Approach as *an* accepted method for determining the fair market value of a property's real property components." (Emphasis added.) The Unified Government argues that Lennhoff's approach to value "certainly has not been endorsed as superior to the well-recognized, widespread, and longstanding Management Fee Approach for valuing hospitality properties."

While asserting the widespread popularity of the Management Fee Approach, the Unified Government does not provide us with any authority in the context of a casino valuation declaring Lennhoff's approach to be so deficient as to require reversal of a BOTA valuation decision based upon it. Our role is not to determine which approach is superior. Rather, we are limited to determining whether substantial competent evidence supports BOTA's ruling. *Chowning*, 32 Kan. App. 2d at 987.

The Unified Government relies on *Marriott Corp.* for the proposition that the Rushmore Method—used by Mellen in her appraisal—is the preferred method to determine the value of hotels in Kansas. In that case, the attack—unlike here—was on the propriety of the Rushmore Method. The court in *Marriott Corp.* recognized the Rushmore model for valuing hotels as "a valid method for determining the fair market value of the hotel in this case." 25 Kan. App. 2d 840, Syl. ¶ 4. The court did not state it is the only proper method of valuation. It did not state that it is the preferred method, as represented by the Unified Government. In fact, in arriving at its valuation in *Marriott Corp.* BOTA stated:

> "'While we find that the county's use of the Rushmore method represents the fair market value of the property in this case, we stop short of saying that the Rushmore model is THE method to value all hotels. We do find that, in this instance, however, the

23

Rushmore method was supported by the county's own figures and does represent the fair market value of the subject property.'" *Marriott Corp.*, 25 Kan. App. 2d at 844.

In reaching its conclusion, the court in *Marriott Corp.* recognized it should not substitute its judgment for that of BOTA and stated there is nothing in the record "to indicate the Rushmore method was so inappropriate and so badly flawed that its use requires a reversal of the valuation of the Marriott." 25 Kan. App. 2d at 844.

The Unified Government notes that the *Marriott Corp.* court cited numerous cases outside of this jurisdiction approving of the Rushmore approach. See, e.g., *Hull Junction Holding Corp. v. Princeton*, 16 N.J. Tax 68, 84 (1996); *Prudential Ins. v. Tp. of Parsippany*, 16 N.J. Tax 58, 60 (1995). But none supports the Unified Government's position that BOTA erred in adopting Lennhoff's appraisal methodology in this case.

We find the *Marriott Corp.* holding more supportive of the Taxpayer's position rather than the Unified Government's position because it appropriately identifies the role of this court in reviewing BOTA's determination of the proper valuation method. As in *Marriott Corp.*, the party challenging BOTA's ruling has failed to show that the adopted valuation method was inappropriate or badly flawed.

The Unified Government also cites various cases in which Lennhoff's appraisals were rejected by various courts outside of this jurisdiction:

● *Vienna Metro LLC v. Bd. of Supervisors*, 86 Va. Cir. 421, at *2 (Va. Cir. 2013) (noting that Lennhoff employed adjustments in his appraisal which seriously undermine the credibility of his opinion).
● *GGP - Maine Mall, LLC v. City of South Portland* (South Portland Board of Assessment Review's Findings of Fact and Conclusions of Law on

24

Petitions for Tax Abatement, August 17, 2011) (the Board notes that other jurisdictions have expressed misgivings about Lennhoff's Business Evaluation Approach).

● *RRI Acquisition Co., Inc. v. Supervisor of Assessments of Howard County*, No. 03-RP-HO-0055, 2006 WL 925212, at *6 (Md. Tax 2006) (court rejects Lennhoff's impermissible adjustments to the Rushmore approach).

● *Chesapeake Hotel LP v. Saddle Brook Tp.*, 22 N.J. Tax 525, 532-33 (2005) (Lennhoff's proposed adjustments are not persuasive).

● Tennessee State Board of Equalization's Initial Decision and Order in *In re Wolf-chase Galleria Ltd. Partnership* for Tax Years 2001, 2002, and 2003 (August 26, 2003 and March 16, 2005) (ALJ finds that Rushmore persuasively argues that Lennhoff's methodology for separating the real property from the hotel's value understates the value of the real property).

● *Merle Hay Mall v. Board of Review*, 564 N.W.2d 419, 424 (Iowa 1997) (business enterprise value theory is not a generally recognized appraisal method).

But none of these cases shows that Lennhoff's methodology or approach in this case was flawed. They are all fact-specific and none involves the valuation of real estate underlying a casino. Both parties agree that Lennhoff is widely accepted as an appraisal expert regarding special use properties. The Unified Government merely asserts that its expert is superior.

The Unified Government attacks Lennhoff's approach as a violation of Kansas law, asserting that it fails to take into account any of the specific aspects of the real estate. See K.S.A. 2017 Supp. 79-503a (definition of fair market value includes a list of factors that should be considered in valuing property, including the size of land, improvements,

and the effect of location on value). The Unified Government asserts that Lennhoff's approach fails to take into account improvements, amenities, or location. The Unified Government further complains that Lennhoff failed to conduct any market participant interviews. See The Appraisal of Real Estate, Appraisal Institute, 712-13 (14th ed. 2013) (in valuing specific property types, appraisers may interview market participants to ascertain how buyers and sellers of the properties valued or allocated intangible assets in pricing decisions). And the Unified Government claims that by failing to conduct the interviews, Lennhoff ignored a whole category of insightful information. Finally, the Unified Government attacks the Kinnard Study that Lennhoff relies on in conducting his market study analysis.

This comprehensive attack to Lennhoff's approach illustrates why our court's role on appeal is limited. With a broader standard of review, parties could endlessly pick apart every aspect of a methodology or the specific data relied on by the appraiser to reach his or her conclusions as to value. Despite all of this information, we find the Unified Government has failed to show that BOTA's decision is not supported by the evidence, is contrary to law, or is arbitrary or capricious. Lennhoff's methodology was accepted by BOTA as a credible and comprehensive approach to value in this case, and the Unified Government has failed to show otherwise. Our role is not to reweigh the evidence.

Finally, the Unified Government argues that BOTA erred in adopting Lennhoff's valuation approach because it relied on evidence that BOTA had determined to be irrelevant and nondiscoverable.

In its discovery request, which BOTA denied, the Unified Government sought sales and lease information from Penn National Gaming—an out-of-state nonparty—about real estate transactions relating to Penn's casino properties held by Gaming and Leisure Properties, Inc. in a publicly traded REIT. Penn is a publicly traded Pennsylvania

corporation and is "several layers beyond any direct joint venture equity ownership of [Kansas Entertainment]."

● One of Penn's many subsidiaries is Penn Tenant, LLC, a Pennsylvania limited liability company.

● One of Penn Tennant's many subsidiaries is Delvest, LLC, a Delaware limited liability company.

● One of Delvest's many subsidiaries is PHKI.

● PHKI owns 50% of the Taxpayer, Kansas Entertainment.

● Kansas Entertainment owns the Hollywood Casino at the Kansas Speedway.

The Unified Government argued that the sought-after information included relevant sales data of the real estate component of casinos that would assist the Unified Government in establishing the value of the Taxpayer's property. Neither the Taxpayer nor either of its joint venture owners has an interest in the REIT. The requested documents were in the sole possession of Penn, and the Taxpayer did not have a right to demand them. The Taxpayer argued that the sales data from Penn's REIT-owned properties were not relevant to the valuation issue.

BOTA denied the Unified Government's discovery request for two reasons: (1) that valuation of other properties owned by the Taxpayer's parent corporation or subsidiaries was not relevant to the valuation of the subject property; and (2) the discovery request attempted to obtain documents from nonparties not involved in the joint venture. BOTA's order on the Unified Government's second motion to compel states:

"The Board finds that the request made of the Taxpayer is overly broad and that nothing is presented to show that the valuation of other properties owned by the parent

27

corporations or subsidiaries of the subject property's owners are relevant to the valuation of the subject property. In addition, the Unified Government's discovery request attempts to obtain documents from non-parties.

. . . .

"Here, the Unified Government is seeking information from entities that are not part of the joint venture which includes the subject property."

BOTA concluded that the sales information about Penn's REIT-owned properties was irrelevant in the valuation of the Taxpayer's property, and the Unified Government claims it relied on this ruling in proceeding to the hearing.

As part of Lennhoff's income approach, he estimated the business enterprise value of Hollywood Casino using "broad averages of national and international casino operators." Lennhoff then evaluated the percentage of the property allocated to real estate—i.e., the percentage of the total enterprise value that is typically real estate. In determining the allocation percentage applicable to the subject property, Lennhoff relied primarily on casino sales to arrive at an allocation of 30%. BOTA adopted this conclusion. In relying on sales from across the country, Lennhoff included one property that was sold to Penn and later transferred to Penn's REIT.

As a preliminary matter, the Unified Government fails to show how this issue was preserved for appeal. Because this is an evidentiary matter, the Unified Government was required to state its objection on the record to the complained-of evidence. If no objection was made, then this issue has not been preserved for appeal. K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *Foster v. Stonebridge Life Ins. Co.*, 50 Kan. App. 2d 1, 25, 327 P.3d 1014 (2012). We find this evidentiary issue was not properly preserved because the Unified Government failed to make a specific objection to the admission of Lennhoff's appraisal based on the discovery ruling.

28

Even so, the Unified Government has failed to show reversible error. The scope of discovery differs significantly between parties and nonparties. The relevance standard of Kansas Rules of Civil Procedure is not the sole measure of discovery requests to nonparties. See *Bio-Vita, Ltd.*, 138 F.R.D. at 17. "To obtain discovery from nonparties, a party must establish that its need for discovery outweighs the nonparty's interest in nondisclosure." 138 F.R.D. at 17; see *In re Cusumano*, 162 F.3d at 717 ("Although discovery is by definition invasive, parties to a lawsuit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon nonparties is a factor entitled to special weight in evaluating the balance of competing needs.").

Here, Lennhoff apparently considered one sale that might have been discoverable in the Unified Government's discovery request. But in looking at the record as a whole, we fail to see—and the Unified Government fails to explain—how considering this one transaction had any significant effect on Lennhoff's valuation of the Taxpayer's property. When reviewing an agency action under K.S.A. 2017 Supp. 77-621(c), we take into account the rule of harmless error. K.S.A. 2017 Supp. 77-621(e); *Sierra Club*, 298 Kan. at 47. The Unified Government does not explain how Lennhoff considering this one sale among all the others affected BOTA's valuation decision.

The information regarding the REIT-owned casino was used to calculate the portion of the purchase price that was allocated to the real estate. Lennhoff's allocation conclusion was based on the average of numerous casinos. The evidence in this case consisted of hundreds of pages of appraisals and exhibits, as well as about 900 pages of testimony. The fact that the selling price of one REIT-owned casino made it into the data set is harmless without a showing that it significantly altered the results. Here, the Unified Government contends that its trial strategy would have changed if it had that

29

information, but it does not show that it was prejudiced by the inclusion of the number in Lennhoff's appraisal. Any error was harmless.

Affirmed.